[No. B220346. Second Dist., Div. Eight. Apr. 6, 2010.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MARCOS BARBOZA COSTA, Real Party in Interest.

## Counsel

Steve Cooley, District Attorney, Irene Wakabayashi, Shirley S. N. Sun and Natasha Cooper, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Law Offices of Mark J. Werksman, Steve Meister and Kelly C. Quinn for Real Party in Interest.

## Opinion

**BIGELOW, P. J.—**

### INTRODUCTION

Marcos Barboza Costa was at the wheel of his 25-ton semitrailer truck carrying a load of vehicles when he sped down Angeles Crest Highway, ran a

red light, and hit a small vehicle on Foothill Boulevard, killing the two occupants. Others were also injured as the truck continued its perilous trek through the intersection, stopping only when it crashed into a bookstore and nail salon. After considering the evidence before it, a grand jury returned an indictment against Costa charging two counts of second degree murder.

We are called upon to determine whether the trial court erred in granting Costa's motion to dismiss the murder charges. We conclude it did. The evidence before the grand jury was sufficient to support a rational ground for inferring the possibility that Costa decided to continue to drive his truck down Angeles Crest Highway with an actual awareness of the great risk of harm his actions created, resulting in the deaths of two people. We therefore grant the People's petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

The relevant evidence before the grand jury was as follows: The Angeles Forest and Angeles Crest Highways (together referred to as the Highway) form a steep, two-lane, two-way, mountainous, winding road that runs through the Angeles National Forest. The Highway has numerous turnouts and a passing lane. Commuters use the Highway as a shortcut between Palmdale and Los Angeles. But the Highway is not suitable for heavy trucks. Indeed, as of April 1, 2009, the beginning of the Highway (where it connects with the Antelope Valley Freeway) had a white sign depicting a black truck with a red circle and line through it, prohibiting vehicles over three tons.

On April 1, 2009, Juan Palomino, a County of Los Angeles firefighter, was driving home in his personal vehicle on his usual route from work at the Mt. Gleason station in the Angeles National Forest. He was southbound on the Highway about 4:15 p.m. when he caught up to an 18-wheel, semitrailer diesel truck transporting a load of vehicles. The 25-ton truck was registered to Costa, holder of a class A commercial driver's license. The truck was traveling about 15 miles per hour and emitting a continuous cloud of white smoke from its rear left wheels, along with a smell of burning rubber. During the three miles that Palomino followed the truck, it crossed the center dividing line five or six times.

Because the presence of such a large truck on the Highway was something "out of the norm," Palomino decided he would try to stop the driver and advise him. He pulled up next to the truck, honked his horn, and asked the

driver to pull over.[1] They pulled over in a two-lane passing area near the Monte Cristo Campground.

Costa, who was sitting in the truck's passenger seat at the time, got out and told Palomino that he was going to Los Angeles. Palomino did not identify himself as a firefighter, but told Costa the following: (1) The Highway was a bad route for a truck so large, and that he had never seen a truck that size on the Highway; (2) the truck's brakes were "putting out a lot of smoke"; (3) the truck's brakes would be under even more stress on the downhill portion of the Highway going into La Cañada; (4) the rear of the truck's trailer had been crossing over the Highway's double yellow lines; (5) the Highway gets steeper, narrower, and has sharper turns before its descent into the La Cañada area; (6) a lot of rush hour traffic would be coming up the Highway (northbound) from La Cañada; and (7) two miles beyond the Monte Cristo Campground, Costa would reach a low-profile tunnel that could accommodate his large truck only if he drove down the middle of the two lanes, and that rush hour traffic would be coming in the opposite direction.

Palomino kept emphasizing that rush hour traffic was approaching and Costa needed to be careful because his brakes were smoking, his truck was already crossing the yellow line, and the road would get steeper and narrower, and the turns sharper. He also advised Costa, "If I were you, I would turn around here and go back." Palomino advised him that where they had pulled over was the best place to turn around because it was the one area with two passing lanes, thereby giving Costa four lanes to turn the truck around. Costa appeared to be listening to what Palomino was saying.

Costa did not indicate he would be turning around, so Palomino provided Costa with an alternative route that would avoid the narrow tunnel and be on an upgrade—Upper Big Tujunga Canyon Road. Costa asked for the location of Upper Big Tujunga, so Palomino drew him a map. Costa did not indicate whether he would take this route. After 15 minutes of talking to Costa, Palomino again told him to be careful, emphasized rush hour traffic was coming from the opposite direction, and left in his vehicle.

A short time later, Joshua Kent was driving north on the Highway toward the Antelope Valley when he saw a dark red or orange semitrailer truck carrying a load of vehicles. The truck crossed over into Kent's lane as he came around a left bend about a mile after the Mill Creek Summit Station, which is quite a distance before the Monte Cristo Campground. Kent had to immediately react to avoid a collision. Kent, who used the Highway daily to

---

[1] The person driving the truck at the time it pulled over on the side of the Highway had a very light complexion, with long blonde or red hair. That person is not a party to this writ proceeding. In contrast, Costa is Hispanic and has a medium to dark complexion.

commute to work from the Antelope Valley, had never seen such a large truck on that portion of the Highway. He said the truck was going "extremely fast" and was "unsafe."

Thomas Kimrey, an off-duty detective with the Los Angeles Police Department, was driving northbound on the Highway about 5:00 p.m. on his way home to the Antelope Valley when he was startled by the sight of a red semitrailer truck. Kimrey was taken aback because in the eight years he had traveled on the Highway he had never seen a truck so large use the Highway. A lot of white-gray smoke was "billowing" out from the tires. The driver was a male Hispanic with a medium to dark complexion.

About the same time, firefighters Raul Corona and Kristen Brownlee had finished their shifts at the Clear Creek Ranger Station and were carpooling south on the Highway when Corona noticed a strong smell of brakes overheating. He saw a dark red semitrailer truck with a thick cloud of white smoke coming from the driver's side rear tires, about 10 feet from the truck's cabin. Corona said the driver of the truck should have seen the smoke in his mirrors because it was coming from both sides of the truck and it was very obvious. Corona wondered why the driver was ignoring the smoking brakes and why he had not used the turnouts that were obviously available to him to stop his truck when his brakes still appeared to be working.

Corona and Brownlee continued to follow the truck even though it was going faster. About 5:30 p.m., the truck passed the golf course at La Cañada Flintridge Country Club. It moved into the middle of the two lanes as smoke poured out of its brakes. The brakes started smoking even more as the truck went around the last turn before the straight downhill descent into La Cañada. The truck started gaining speed, now appearing as if it had lost its brakes completely. It continued to gain speed all the way down the hill, traveling about 60 miles per hour in an area limited to 45 miles per hour.

As the truck neared the traffic on Foothill Boulevard, there was no indication the driver used the truck's horn or Jake Brake system.[2] The truck ran through the red lights on Foothill Boulevard and collided into vehicles in the middle of the street as well as vehicles stopped at red lights before crashing into a bookstore and nail salon.

Seven vehicles were involved in the crash. Angel Posca and his 12-year-old daughter Angelina Posca were in their small red Ford directly in the path of the speeding truck. The truck hit the red Ford at an excess of 53 miles per

---

[2] A Jake Brake system is a supplemental exhaust brake system that helps slow a semitrailer truck and emits a loud noise.

hour and dragged it 150 feet. Angel and Angelina were killed instantly. A number of persons in other vehicles were injured, as well as two women who were in the nail salon. Costa was identified as the driver of the truck. He was not under the influence of either drugs or alcohol.

Los Angeles County Deputy Sheriff James Peterson, an expert in conducting commercial vehicle inspections, testified that commercial drivers and codrivers are required by federal law to complete a daily "pre-trip inspection" on their vehicle before operating it on the road. The inspection includes visually checking the brakes to make sure they are functioning properly, and physically measuring the pushrod travel for the brake chambers to ensure they are within federal guidelines for safety.

Deputy Peterson inspected Costa's truck after the collision and determined that five of the 10 brakes were completely inoperable or out of adjustment prior to the collision. The five brakes that were working showed signs of overheating and cracking on the pads. This brake problem would have been readily apparent during a pretrip inspection and would have required that the truck be placed out of service.

According to Deputy Peterson, Costa compounded the problem by taking his heavy truck on the Highway's steep, windy, two-lane, mountainous road when only 50 percent of its brakes were working. Because half of the brakes were not working, the functioning brakes overheated as the truck was going down the hill, ultimately causing brake failure. Deputy Peterson said that if all of the brakes had been working properly, Costa would have been able to stop the truck to avoid the collision.

Deputy Peterson further indicated that when brakes start smoking it means the brake linings are catching fire and it is the beginning of brake failure. A commercial driver with a class A license is required to check his mirrors to make sure his load is secure and he is not creating a traffic jam behind him. While checking his mirrors he would have been able to see if his brakes were smoking. Once brakes start smoking, the driver must pull the truck over and wait between two and eight hours for the brakes to cool off.

Based upon this evidence, the grand jury returned an indictment with multiple charges, including two counts of second degree murder. Costa moved to dismiss these charges under Penal Code section 995, arguing there was insufficient evidence before the grand jury of implied malice to warrant the indictment.[3] The People opposed the motion. The trial court agreed with Costa and granted his motion, concluding Palomino's warnings did not rise to

---

[3] All further code references are to the Penal Code.

the level of creating in Costa a sufficient subjective awareness of the risk involved in driving down the Highway.

The People filed a petition for writ of mandate challenging the trial court's ruling, contending the evidence before the grand jury was sufficient to warrant the indictment for second degree murder. We stayed the pending trial and issued an alternative writ of mandate.[4]

## DISCUSSION

### 1. *The Law of Implied Malice*

■ Second degree murder is the unlawful killing of a human being with malice aforethought, but without the additional elements that it be willful, deliberate and premeditated, which are required for first degree murder. (§§ 187, subd. (a), 189; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].) Malice may be implied when a person does " ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279] (*Watson*); see *Benitez*, at p. 104; *People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666]; § 188.)

Implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his or her actions. (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1217 [264 Cal.Rptr. 841, 783 P.2d 200]; *Watson, supra*, 30 Cal.3d at pp. 296–297.) Malice may be found even if the act results in a death that is accidental. (*People v. Contreras* (1994) 26 Cal.App.4th 944, 954 [31 Cal.Rptr.2d 757] (*Contreras*).) It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence. (*People v. James* (1998) 62 Cal.App.4th 244, 277 [74 Cal.Rptr.2d 7].)

■ California has followed the above rule of implied malice in vehicular homicide cases. Our Supreme Court has stated that when "the facts demonstrate a subjective awareness of the risk created, malice may be implied. [Citation.] In such cases, a murder charge is appropriate." (*Watson, supra*, 30

---

[4] While the People could have appealed the trial court's ruling partially dismissing the indictment (§ 1238, subd. (a)(1)), we determined this remedy was inadequate because of the likelihood of multiple trials or significant delay, and that review by writ was appropriate. (See *People v. Superior Court (Lujan)* (1999) 73 Cal.App.4th 1123, 1125 [87 Cal.Rptr.2d 320] (*Lujan*).)

Cal.3d at p. 298.) In *Watson*, the leading case, the defendant had consumed enough alcohol to become legally intoxicated. "He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later." (*Watson*, at p. 300.) The court presumed the defendant "was aware of the hazards of driving while intoxicated." (*Ibid.*) The *Watson* court went on to cite the defendant's conduct in driving through city streets at excessive speeds, his near collision with another vehicle after running a red light, and his belated attempt to brake before the fatal crash as "suggesting an actual awareness of the great risk of harm which he had created." (*Id.* at p. 301.)

While many of the published vehicular homicide cases, including *Watson*, involved an intoxicated defendant or a high-speed chase, "the absence of intoxication or high speed flight from pursuing officers does not preclude a finding of malice." (*Contreras, supra*, 26 Cal.App.4th at p. 955.) Indeed, our courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach. (*People v. Olivas* (1985) 172 Cal.App.3d 984, 989 [218 Cal.Rptr. 567]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 535 [224 Cal.Rptr. 846].)

## 2. *Standard of Review*

■ Before determining whether the facts of this case support an indictment for second degree murder, it is critical that we outline the legal standard that must guide our review. A grand jury's function is to determine whether probable cause exists to *accuse* a defendant of a particular crime. (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026–1027 [13 Cal.Rptr.2d 551, 839 P.2d 1059] (*Cummiskey*) [grand jury is functional equivalent of magistrate presiding over preliminary hearing].) That means that such an accusation, or indictment, is sufficiently based upon probable cause " ' " 'if there is some rational ground for assuming the *possibility* that an offense has been committed and the accused is guilty of it.' " ' " (*Id.* at p. 1027, italics added; see *People v. Pic'l* (1982) 31 Cal.3d 731, 737 [183 Cal.Rptr. 685, 646 P.2d 847] (*Pic'l*).)

" ' "Evidence that will justify [an indictment] need not be sufficient to support a conviction . . . ." ' " (*People v. Slaughter* (1984) 35 Cal.3d 629, 637 [200 Cal.Rptr. 448, 677 P.2d 854].) An indictment may be justified even if the evidence leaves some room for doubt. (*Cummiskey, supra*, 3 Cal.4th at p. 1029.) As a result, an indictment should be set aside only if there is no evidence that a crime was committed or there is no evidence to connect the defendant with a crime shown to have been committed. (*Lujan, supra*, 73 Cal.App.4th at p. 1127; *People v. Chapple* (2006) 138 Cal.App.4th 540, 545 [41 Cal.Rptr.3d 680] ["total absence" of evidence required for dismissal].)

■    In the context of a motion to dismiss an indictment under section 995, the grand jury sits as the finder of fact, while the superior court sits as the reviewing court. (*Pic'l, supra,* 31 Cal.3d at p. 737.) Every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment. (*Ibid.*) The superior court, as the reviewing court, may not substitute its judgment as to the weight of the evidence for that of the fact finder. (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1147–1148 [80 Cal.Rptr. 747, 458 P.2d 987].) And, while there must be *some* showing as to the existence of each element of the crime, such a showing may be made by means of circumstantial evidence supportive of reasonable inferences. (*Ibid.*) As the appellate court reviewing an indictment, we disregard the trial court's ruling and directly review the grand jury's determination. (*People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].)

## 3.  *The Indictment Was Appropriate.*

The circumstances leading up to the fatal crash in this case show that Costa possessed a valid class A commercial driver's license, evidencing his knowledge of the requirements for the safe operation of large semitrailer trucks in accordance with the law. Costa was required, every time he used his truck, to perform a pretrip inspection that included making a determination that all of the brakes were functioning properly.

Deputy Peterson testified that, prior to the crash, five of the 10 brakes on the truck did not work at all or were seriously out of adjustment, legally requiring that the truck be placed out of service. The problems with the brakes would have been readily apparent during the required pretrip inspection. A reasonable inference from the above evidence is that Costa knew that fully functioning brakes were required for the safe operation of his truck, that he was required to perform a pretrip inspection, and that he either failed to perform the inspection or performed one and ignored the fact the brakes were not working as required.

As Costa and his codriver were heading down the Highway, a two-lane, narrow, winding, and steep mountainous road, the smell of the overheating breaks was clearly evident and plumes of smoke were coming out of the truck's brakes. Deputy Peterson testified that a driver like Costa was required to look at his rearview mirror and would have seen the smoke from his brakes. Such smoking of the brakes is evidence of brake failure, requiring the driver to stop the vehicle. A reasonable inference from this evidence is that Costa and his codriver either failed to look at their rearview mirrors or looked and ignored the smoking brakes.

Even assuming Costa had failed to notice his brakes were overheating and emitting clouds of smoke, Palomino let him know exactly what was happening with his truck. Palomino informed Costa that (1) the Highway was a bad route for a semitrailer truck and that he had never seen one that large on that part of the Highway; (2) his truck had been crossing over the double yellow lines; (3) the brakes on the truck were "putting out a lot of smoke"; (4) his brakes would be under even more stress going into La Cañada, where the Highway gets steeper, narrower, and has sharper turns; (5) it was rush hour and there would be a lot of commuters coming up the Highway towards the truck; and (6) he should turn the truck around, and the place they had pulled over was the best place to do that.

■ Costa was apprised of the condition of his truck—the brakes were putting out a lot of smoke, which is evidence of brake failure. As noted earlier, the grand jury was entitled to infer from the evidence that he had either failed to perform a pretrip inspection or performed one and ignored the fact the brakes were not working as required. Either way, the evidence suggested Costa knew the importance of fully functioning brakes and that the brakes on his large semitrailer truck were not functioning as required. Despite being apprised of the condition of his brakes, the nature of the steep, winding road ahead, and the fact many drivers would be on the road at that time, Costa decided to continue to drive his 25-ton, 18-wheel truck into La Cañada. His brakes continued to put out more and more streams of smoke, yet he decided to drive past two turnouts while the brakes were still barely working, ultimately driving onto Foothill Boulevard and killing Angel and his daughter.

Based upon this evidence and the reasonable inferences that may be drawn from it, and also keeping in mind the standard required to survive a section 995 motion, we conclude there is some rational ground for inferring the possibility that Costa was aware of the risk to human life posed by continuing to drive his large semitrailer truck down the Highway, and that he consciously and deliberately disregarded that risk. Like the court in *Watson*, "[w]e do not suggest that the foregoing facts conclusively demonstrate implied malice, or that the evidence necessarily is sufficient to convict defendant of second degree murder. . . . We merely determine that the evidence before us is sufficient to uphold the second degree murder counts in the [indictment], and to permit the prosecution to prove, if it can, the elements of second degree murder." (*Watson, supra*, 30 Cal.3d at p. 301.)

Costa argues that *Watson* and similar cases supporting vehicular homicide are inapplicable here because there is no evidence of intoxication or a high-speed pursuit. But as already noted, "the absence of intoxication or high speed flight from pursuing officers does not preclude a finding of malice."

(*Contreras, supra*, 26 Cal.App.4th at p. 955.) Costa's lack of intoxication in this case, therefore, does not provide him with any refuge. To the contrary, it suggests that he caused the accident without any impairment of his faculties.

Costa also argues that there was no evidence he was subjectively aware of the dangerous nature of his activity, because Palomino merely provided him with an alternative route to avoid a tunnel and never directly told him that what he was doing was dangerous. This argument misses the point. The question here is whether there was sufficient evidence suggesting actual awareness of the great risk of harm posed by continuing to drive the truck down the Highway. Palomino's testimony suggests Costa had sufficient awareness of the risk involved because he was told about the condition of his brakes, the nature of the road, and the fact his large semitrailer truck would be on the road with many rush hour drivers.

## DISPOSITION

The petition for writ of mandate is granted. The trial court is directed to vacate its order granting Costa's motion to dismiss the two counts of second degree murder from the indictment and issue a different order denying the motion. Our prior order staying the pending trial is vacated.

Rubin, J., and Flier, J., concurred.