Filed 9/8/16  P. v. Guzman-Pena CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAVIER GUZMAN-PENA,<br><br>    Defendant and Appellant. | B268866<br><br>(Los Angeles County<br>Super. Ct. No. MA065836) |

Appeal from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Reversed in part and affirmed in part.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

On the afternoon of April 19, 2015, defendant Javier Guzman-Pena was driving in an uninhabited area of Lancaster. He failed to stop at a stop sign and rear-ended a motorcycle, killing the cyclist. Guzman-Pena showed signs of intoxication at the scene, and subsequent tests established that his blood alcohol concentration at the time of the accident was approximately 0.16 percent, or more than twice the legal limit. A jury convicted Guzman-Pena of gross vehicular manslaughter and second degree murder. Guzman-Pena concedes the jury's manslaughter conviction was appropriate but appeals the murder conviction, arguing there is no substantial evidence to support the jury's implied malice finding. We agree and therefore reverse the murder conviction. We affirm the judgment in all other respects.

## FACTS AND PROCEDURAL BACKGROUND

The accident occurred in an uninhabited area of Lancaster at the intersection of 90th Street and Avenue K (the intersection). The intersection is controlled by stop signs at all four corners, and the area surrounding the intersection is flat and unobstructed, allowing drivers to see for at least a mile in each direction.

At approximately 2 p.m. on April 19, 2015, Guzman-Pena was driving a pickup truck northbound on 90th Street, at or near the posted speed limit of 55 miles per hour. As he approached the intersection, Guzman-Pena passed a cautionary sign indicating he would encounter a stop sign at Avenue K. In addition, the words "stop ahead" appeared on the roadway, approximately 300 feet before the intersection.

Guzman-Pena did not stop when he reached the intersection. Based upon the evidence at the scene, including the skid marks left by the pickup truck and the debris field around the point of impact, California Highway Patrol (CHP) officers concluded that Guzman-Pena's truck entered the intersection while travelling at approximately 55 to 60 miles per hour and rear-ended a motorcycle, which was also traveling northbound on 90th Street. The motorcycle had already stopped at the stop sign and was, at the time of the collision, moving northbound into the intersection. The skid marks indicated Guzman-Pena did not brake prior to impact. The subsequent vehicle

2

inspection revealed no mechanical defects or brake problems which would have contributed to the accident.

The pickup truck sustained significant damage to the left front bumper as a result of the collision with the motorcycle, which rolled over after impact and became lodged under the truck's front bumper. Guzman-Pena continued to depress the accelerator after impact, causing the truck and the motorcycle to travel approximately 360 feet before coming to rest in a dirt field adjacent to 90th Street. According to the officer on scene, the truck stopped after its rear wheels became stuck in the dirt. Although the driver of the motorcycle was wearing protective gear, including a helmet, he sustained severe injuries and died at the scene. Guzman-Pena was not injured; he was wearing his seatbelt at the time of the collision.

A CHP officer spoke to Guzman-Pena at the scene and noticed possible signs of intoxication, including red, watery eyes, difficulty standing still, and a strong odor of alcohol coming off Guzman-Pena's breath. The officer also observed that while Guzman-Pena was standing, he was swaying slightly and having some difficulty maintaining his balance. The officer asked Guzman-Pena whether he had anything to drink earlier that day, and he initially said he drank a glass of milk. Upon further questioning, Guzman-Pena admitted he consumed one beer earlier in the day. However, Guzman-Pena remained cooperative. The officer administered several field sobriety tests, each of which revealed signs of intoxication. The officer then administered two preliminary alcohol screening tests at the scene. The first test indicated Guzman-Pena's blood alcohol concentration was 0.162 percent, more than twice the legal limit. The second test result was slightly lower at 0.152 percent, and was within the margin of error for the test. The officer arrested Guzman-Pena for driving under the influence of alcohol and took him to the hospital. The hospital took a blood sample which showed Guzman-Pena had a blood alcohol concentration of 0.1 percent, which was consistent with the higher results of the tests administered at the scene, given the passage of time. According to the People's expert, in order to reach that level of intoxication,

3

Guzman-Pena would likely have consumed between three and five standard drinks, such as a can of beer, prior to the accident.

As part of the follow-up investigation, a CHP officer spoke to Guzman-Pena approximately two days after the accident, while he was in custody. During the interview, Guzman-Pena admitted he had been drinking at a friend's house from 8:30 a.m. to 9 a.m., and stated that he drank two cans of beer during that time. Guzman-Pena thought he was "fine" to drive, even though he had been drinking.

During the follow-up interview, the officer also asked Guzman-Pena if he knew about the dangers of drinking and driving. On that point, the officer testified at trial as follows: "When I asked him if he knew it was dangerous to human life to drink alcohol and drive, he related that he knew the dangers. I asked him if he knew that 'you can kill somebody while driving under the influence of alcohol.' And he stated that he was aware that that would happen or could possibly happen." The officer did not ask whether Guzman-Pena knew about those dangers prior to the accident.

The People filed an information containing four counts: murder (Pen. Code,[1] § 187, subd. (a)); gross vehicular manslaughter (§ 191.5, subd. (a)); driving under the influence of alcohol (Veh. Code, § 23153, subd. (a)); and driving with a blood alcohol concentration of greater than 0.08 percent (Veh. Code, § 23153, subd. (b)). As to counts three and four, the information also alleged Guzman-Pena caused great bodily injury during the commission of a felony within the meaning of sections 1192.7 (serious felony) and 12022.7, subdivision (a) (great bodily injury sentence enhancement). Guzman-Pena pled not guilty to all counts and denied the allegations and enhancements. Defense counsel moved to set aside the murder count, arguing the People failed to present any evidence of implied malice at the preliminary hearing. The court denied the

---

[1] Further undesignated statutory references are to the Penal Code.

4

motion. The jury subsequently found Guzman-Pena guilty of both second degree murder (count one) and gross vehicular manslaughter (count two).[2]

The court sentenced Guzman-Pena to 15 years to life in state prison on the base count (murder) with the possibility of parole after 15 years. The court imposed a six-year sentence on the gross vehicular manslaughter count, and stayed the sentence under section 654. Guzman-Pena timely appeals.

## DISCUSSION

Guzman-Pena contends his second degree murder conviction—specifically, the jury's implied malice finding—is not supported by substantial evidence. We agree.

### A.      Standard of Review

When a defendant challenges the sufficiency of the evidence to support his criminal conviction, this court reviews the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1322; *People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1108-1109 (*Batchelor*).)

### B.      Vehicular Manslaughter Statutes

Drunk driving resulting in a fatality may be prosecuted under several different theories. From least severe to most severe they are: vehicular manslaughter while intoxicated (§ 191.5, subd. (b)), gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), and murder with implied malice (§§ 191.5, subd. (e), 187, subd. (a)). Although Guzman-Pena does not challenge his gross vehicular manslaughter conviction, we briefly summarize the manslaughter statutes because they provide a helpful counterpoint to our discussion regarding the mental state required to support a conviction of implied malice murder.

---

[2]      Counts three and four were dismissed under section 1385.

5

As our Supreme Court has explained, "[m]anslaughter is the unlawful killing of a human being without malice. Originally, two kinds of manslaughter were defined: voluntary and involuntary. [Citation.] In 1945, the Legislature created the offense of vehicular manslaughter, the unlawful killing of a human being while driving a vehicle. [Citation.] In 1983, it further defined vehicular manslaughter as being with or without gross negligence and with or without some form of intoxication. [Citation.] [¶] Three years later, the Legislature enacted the statute . . . defining the crime of vehicular manslaughter with gross negligence while driving under the influence. [Citation.]" (*People v. Bennett* (1991) 54 Cal.3d 1032, 1035-1036 (*Bennett*).) In its current form, section 191.5, subdivision (a), provides: "Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140 [driving under the influence under age 21], 23152 [driving under the influence], or 23153 [driving under the influence with bodily injury] of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, and with gross negligence." (§ 191.5, subd. (a).)

The mental state required to support a conviction of gross vehicular manslaughter is well established: "Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. (*People v. Watson* (1981) 30 Cal.3d 290, 296.) 'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I don't care what happens." ' (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.) The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. (*People v. Watson, supra,* 30 Cal.3d at p. 296.)" (*Bennett, supra*, 54 Cal.3d at p. 1036.)

Notably, " '[t]he mere fact that a defendant drives a motor vehicle while under the influence of alcohol and violates a traffic law is insufficient in itself to constitute

6

gross negligence.' " (*Bennett, supra*, 54 Cal.3d at p. 1039.)  Instead, the jury examines "*all* the relevant circumstances, including the manner in which the defendant operated his vehicle, the level of his intoxication, and any other relevant aspects of his conduct" in order to determine whether defendant's conduct rises to the level of gross negligence, as opposed to mere inadvertence.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1207; *People v. Givan* (2015) 233 Cal.App.4th 335, 348-349.)  The level of intoxication is particularly relevant because " '[o]ne who drives with a very high level of intoxication is indeed more negligent, more dangerous, and thus more culpable than one who drives near the legal limit of intoxication, just as one who exceeds the speed limit by 50 miles per hour exhibits greater negligence than one who exceeds the speed limit by 5 miles per hour.' " (*Bennett, supra*, 54 Cal.3d at p. 1037.)

By creating the gross vehicular manslaughter offense, "the Legislature sought to punish severely those who operate a vehicle when their physical and mental faculties are impaired by voluntary alcohol consumption." (*Bennett, supra*, 54 Cal.3d at p. 1039.)  "When the Legislature enacted section 191.5, it stated:  'The Legislature finds and declares that traffic accidents are the greatest cause of violent death in the United States and that over one-half of the ensuing fatalities are alcohol related. . . .  In view of the severe threat to public safety which is posed by the intoxicated driver, there is a compelling need for more effective methods to identify and penalize those who voluntarily consume alcoholic beverages to the point of legal intoxication and thereafter operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of exerting great force and speed and causing severe damage and death.' [Citation.]" (*Id.* at pp. 1038-1039.)  Currently, a conviction of gross vehicular manslaughter carries a punishment of 4, 6, or 10 years in state prison for the first offense, and 15 years to life for a second offense.  (§ 191.5, subds. (c)(1), (d).)

### C.     Implied Malice Murder

In exceptional circumstances, "[a] person who, knowing the hazards of drunk driving, drives a vehicle while intoxicated and proximately causes the death of another may be convicted of second degree murder under an implied malice theory."

7

(*Batchelor, supra*, 229 Cal.App.4th at p. 1112; *People v. Watson* (1981) 30 Cal.3d 290, 300–301 (*Watson*).)  The Supreme Court has cautioned, however, that second degree murder should not be routinely prosecuted.  (*Id.* at p. 301 ["we neither contemplate nor encourage the routine charging of second degree murder in vehicular homicide cases"].)

A conviction of second degree murder requires a finding of malice aforethought. (§ 187, subd. (a).)  Malice may be express or implied; malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (§ 188.)  "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.]"  (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*); *Batchelor, supra*, 229 Cal.App.4th at p. 1112.)

Our courts have extensively discussed the mental state required to support a murder conviction, as opposed to a gross vehicular manslaughter conviction, in a drunk driving case.  Unlike a finding of gross negligence, which may rest upon a jury's objective determination that a reasonable person would have appreciated the risk of harm, a finding of implied malice "depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard."  (*Watson, supra*, 30 Cal.3d at pp. 296-297; *Batchelor, supra*, 229 Cal.App.4th at p. 1113.) Further, the Supreme Court has emphasized "a conviction for second degree murder, based on a theory of implied malice, requires proof that a defendant acted with conscious disregard of the danger to human life."  (*Knoller, supra*, 41 Cal.4th at p. 156.) A defendant's conscious disregard of a substantial risk of bodily injury is insufficient to support a murder conviction.  (*Ibid.*)

Accordingly, in order to establish implied malice, the prosecution must show that a defendant was *subjectively* aware of the risk of death created by driving while intoxicated.  (*Watson, supra*, 30 Cal.3d at p. 298 ["when the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective

8

awareness of the risk created, malice may be implied. (Citation.) In such cases, a murder charge is appropriate"].) "It is not enough that a reasonable person would have been aware of the risk." (*People v. Moore* (2010) 187 Cal.App.4th 937, 941.) As one court explained, "[t]he distinction between 'conscious disregard for life' and 'conscious indifference to the consequences' is subtle but nevertheless logical. Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifference to the consequences is simply, 'I don't care what happens.' It makes sense to hold the former more culpable than the latter, since only the former is actually aware of the risk created." (*People v. Olivas, supra,* 172 Cal.App.3d at pp. 987-988.)

"It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697 (*Costa*); *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358.) Further, "our courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach." (*Costa, supra*, 183 Cal.App.4th at p. 698.)

In *Watson*, *supra*, the leading case, the defendant had consumed enough alcohol to become legally intoxicated. The court found it significant that the defendant "had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later." (*Watson, supra,* 30 Cal.3d at p. 300.) Although the court presumed the defendant was generally "aware of the hazards of driving while intoxicated," the court did not base its holding on that fact. Instead, with respect to the implied malice element, that court emphasized that the "defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car

9

before the collision (as evidenced by the extensive skid marks before and after impact) *suggesting an actual awareness of the great risk of harm which he had created*. In combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Watson, supra*, 30 Cal.3d at pp. 300-301 [emphasis added].)

Subsequent to *Watson*, the courts of appeal have affirmed implied malice murder convictions where, like *Watson*, a defendant's conduct prior to the fatal accident is so blatantly dangerous that it is reasonable for a jury to infer the defendant was aware that his or her conduct endangered the lives of others. In *People v. Moore, supra,* 187 Cal.App.4th 937, for example, the court affirmed a murder conviction where the defendant drove on city streets at speeds ranging from 70 to 90 miles per hour—more than twice the posted speed limit—and repeatedly swerved across the double yellow line, into oncoming traffic. (*Id.* at pp. 939-941; see also *Costa, supra*, 183 Cal.App.4th 690 [affirming denial of motion to dismiss murder charge where defendant drove a large semi-trailer truck on a narrow, steep and winding mountain road, and ignored plumes of smoke emitted by the truck's brakes, the smell of overheating brakes, and warnings from other drivers regarding the narrowness of the road and the clear evidence of brake failure]; *People v. Murray* (1990) 225 Cal.App.3d 734 [affirming murder conviction where intoxicated defendant drove the wrong direction on a freeway at high speed].) The fact that a defendant chooses to drive, despite being warned by others that he or she is too intoxicated to drive, also supports a reasonable inference that the defendant was subjectively aware of the risk posed by driving while intoxicated. (See, e.g., *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092 [affirming murder conviction where the defendant refused offers for a safe ride home, was warned at a bar that she was too drunk to drive and could harm people, and had, on prior occasions, been warned that she was too drunk to drive and might injure someone]; *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1077-1079 [affirming implied malice murder conviction where defendant, a Marine, drove while intoxicated despite repeated warnings from friends

10

that he was too intoxicated to drive, and despite routine warnings from the Marine Corps at liberty briefings regarding the dangers of drinking and driving].)

In addition, courts have affirmed murder convictions on an implied malice theory where, as in *Watson*, the evidence shows the defendant drove to a bar or other location with the intention of drinking alcohol and then driving. (See, e.g., *Batchelor, supra*, 229 Cal.App.4th at p. 1115 [affirming murder conviction where the defendant drove to a bar in order to drink with a friend and intended to drive the friend home after drinking].) Further, a number of courts have concluded that a defendant's prior drunk driving conviction(s), or attendance at educational programs highlighting the hazards of driving while intoxicated, evidence a defendant's subjective understanding and conscious disregarding of the risk to human life created by driving while intoxicated. (See, e.g., *People v. Marlin* (2004) 124 Cal.App.4th 559, 572 [defendant's eight prior convictions for driving under the influence of alcohol provided sufficient basis for no contest plea to implied malice murder charge]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 532 [defendant's prior convictions for driving under the influence and attendance at driver's education program as required by sentences on those convictions admissible to show implied malice].)

The cases we have cited here are representative of the numerous cases in which courts have approved using these facts—a blood-alcohol level above the .08 percent legal limit, a pre-drinking intent to drive, knowledge of the hazards of driving while intoxicated, and highly dangerous driving—as circumstantial evidence indicating a defendant's actual awareness of the risk to human life posed by driving while intoxicated. (See *People v. Talamantes* (1992) 11 Cal.App.4th 968, 973; *Batchelor, supra*, 229 Cal.App.4th at p. 1114.) As we have said, each case must be evaluated individually and we do not suggest that any of these particular facts must be present in order to support an implied malice murder conviction. Nevertheless, these recurrent circumstances provide a touchstone for our analysis of the case before us.

### D.     Analysis

Here, the People contend there is ample evidence to support the jury's implied malice finding.  We are not persuaded.

First, the People assert Guzman-Pena was "not driving a small car at low speed. Rather, he was driving a pickup truck at 55 to 60 miles per hour."  Although those facts are true, the People offer no analysis or citation to relevant case authority to explain why these facts support the jury's implied malice finding.  Our own research reveals that there may be some circumstances in which the size and weight of the defendant's vehicle may be relevant to the implied malice inquiry.  (See, e.g., *Costa, supra*, 183 Cal.App.4th 690 [affirming denial of motion to dismiss murder charge where defendant drove a large semi-trailer truck on a narrow, steep and winding mountain road, and ignored plumes of smoke emitted by the truck's brakes, the smell of overheating brakes, and warnings from other drivers regarding the narrowness of the road and the clear evidence of brake failure].)  However, we are unaware of any case holding, or suggesting, that a jury could reasonably infer that a defendant subjectively appreciated the risk to human life caused by driving while intoxicated simply because the defendant was driving a pickup truck, as opposed to any other non-commercial vehicle.  We find nothing in the record to support such a contention in the present case.

As for the speed Guzman-Pena was driving at the time of the collision, a jury may reasonably infer that a defendant acts with wanton disregard for the risk to human life where he or she drives at *excessive* speed, i.e., at a speed well above the posted limit or well beyond what conditions safely permit.  As already noted, the Supreme Court found that driving 70 to 80 miles per hours in a 35 mile per hour zone, coupled with near misses prior to a fatal collision, could support a finding of implied malice.  (See *Watson, supra*, 30 Cal.3d at pp. 293-294, 301.)  Here, we find the People's reliance on that factor is unwarranted because Guzman-Pena was driving at or near the posted speed limit of 55 miles per hour at the time of the collision, and there is no evidence in the record to indicate that his driving speed was unsafe given the conditions at the time of the accident.  The People do not argue otherwise.

12

Second, the People observe Guzman-Pena's blood alcohol level was approximately twice the legal limit of 0.08% at the time of the accident. Again, the People simply present us with this fact, without providing either case authority or analysis to explain their position. As we have already noted, a reasonable person should realize the risk posed by driving while intoxicated increases as the driver's blood alcohol concentration increases. For that reason, a high level of intoxication is relevant to determine whether an intoxicated driver acts with gross negligence, under the applicable objective standard. (See *Bennett, supra*, 54 Cal.3d at p. 1037 [" '[o]ne who drives with a very high level of intoxication is indeed more negligent, more dangerous, and thus more culpable than one who drives near the legal limit of intoxication' "].) Nevertheless, we have found no authority for the proposition that a high level of intoxication, standing alone, supports a reasonable inference that a defendant was *subjectively* aware of the risk to human life posed by driving while intoxicated prior to the fatal collision, as is required to support a finding of implied malice.

Finally, the People assert Guzman-Pena "told an investigating officer that he knew he could kill someone by driving a car while under the influence of alcohol," and characterize his statement as "incredibly powerful evidence that he was subjectively aware of the danger posed by his conduct." We agree that, as a general matter, a defendant's admission that, prior to the accident, he was aware of the life-threatening consequences of driving while intoxicated, would support a reasonable inference that the defendant acted wantonly, and with a conscious disregard of that risk, by deciding to drive while intoxicated. Such an admission would constitute direct, rather than circumstantial, evidence of implied malice. But here, the People ignore the critical point: Guzman-Pena was asked whether he knew he could kill someone by driving while intoxicated during an interview that took place several days *after* the fatal accident. At that point, the risk of driving while intoxicated—and the reality of having done so—was painfully obvious. But the fact that Guzman-Pena realized he could kill someone by driving while intoxicated when he was in custody *after* doing so does not, in our view, support a reasonable inference that Guzman-Pena acted wantonly and with

13

a conscious disregard of that risk *prior* to the fatal accident. The interviewing officer did not ascertain when Guzman-Pena appreciated the risk of driving while intoxicated, because she believed that fact to be irrelevant. We disagree.

As we have explained, the distinction between the mental states required for gross vehicular manslaughter and implied malice murder is a subtle but important one. To reiterate, "A finding of implied malice, unlike a finding of gross negligence, 'depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard.' " (*Batchelor, supra,* 229 Cal.App.4th at pp. 1112-1113 [citing *Watson*].) However, the People invite us to blur the line between these applicable mental states. Specifically, the People argue here: "Whether appellant was subjectively aware of the grave risk he presented by driving a pickup truck at a high rate of speed with a blood alcohol level that was twice the legal limit 'is best answered by the question: *how could he not be*? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [appellant] was aware of the risk.' "[3] Were we to adopt the People's position and conclude that because anyone would be aware of the risk of driving while intoxicated, we can assume Guzman-Pena was subjectively aware of the risk, we would eviscerate the distinction between the objective standard required for gross vehicular manslaughter and the heightened, subjective standard required for implied malice murder.

---

[3]     The quoted language relied upon by the People is from *People v. Moore, supra,* 187 Cal.App.4th at p. 941. However, the People's reliance on that case is misplaced. There, the defendant drove 70 to 90 miles per hour in a 35 mile per hour zone and crossed into the opposing traffic lane before causing the fatal accident. (*Id.* at pp. 939-941.) That evidence supported a reasonable inference that the defendant was aware of the danger to human life posed by his conduct.

**DISPOSITION**

Defendant's conviction on count one (§ 187, subd. (a)) is reversed. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

STRATTON, J.[*]

---

[*]  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.