ROTHSCHILD, P. J.
*119 Defendant and appellant Hsiu Ying Lisa Tseng, a physician, appeals from the judgment entered upon her convictions of three counts of second degree murder, 19 counts of unlawfully prescribing controlled substances, and one count of obtaining a controlled substance by fraud. She contends that substantial evidence did not support the murder convictions and that the trial court erred in (1) admitting evidence of six uncharged patient deaths; (2) failing to unseal and quash a search warrant of her financial records; (3) failing to grant a mistrial based on prosecutorial misconduct; (4) reopening closing argument; and (5) failing to apply Penal Code[1] section 654 to the murder conviction sentences. None of her arguments are meritorious. We therefore affirm.
FACTUAL AND PROCEDURAL BACKGROUND[2]
A. Tseng's Medical Clinic and Practice
In approximately 2007, Tseng, a licensed physician practicing internal medicine and osteopathy, joined Advance Care AAA
*197 Medical Clinic (the clinic) in Rowland Heights, a general medical practice operated by her husband. When Tseng first joined the clinic, the patients came from the local Hispanic and Asian communities, the wait time for each patient was 15 to 30 minutes and 90 percent of the patients paid for treatment through their insurance.
By 2008, the practice and the clientele of the clinic had changed. Most of Tseng's patients were now white males in their 20's and 30's who came from *120 outside Los Angeles County seeking pain and anxiety management medications. By 2010, the clinic had developed a reputation as a place where patients could easily obtain prescriptions for controlled substances, including opioids, sedatives, muscle relaxants, and drugs used to treat drug addiction. In addition, fees had doubled, and nearly all patients paid in cash.[3] The clinic's income increased from $600 a day in cash to $2,000 to $3,000 per day.[4]
According to one visitor, the clinic looked "like a parole office" with "drug dealing." The wait time for Tseng's patients also increased to about six hours with 20-30 patients inside the waiting room or outside the clinic at any one time. Some patients appeared to be under the influence of drugs or suffering from drug withdrawals, and one patient overdosed in the waiting room. When G.R., the clinic's receptionist, expressed concern about the number of patients waiting and the level of anxiety and agitation they expressed in the waiting room, Tseng told her that they were "druggies" and could wait.
B. Tseng's Treatment and Prescribing Methods Beginning in 2008
Tseng spent about 10 to 15 minutes with new patients and five minutes with them on return visits. Often she would see two or three unrelated patients in the same examination room at the same time. Tseng would often undertake no (or only a cursory) medical examination of her patients; patients for whom she would prescribe pain medications often expressed nonspecific complaints about anxiety and pain from old injuries. Many times, she did not obtain an adequate medical history or prior medical records before prescribing medications. For example, she did not do drug testing or review the California's Controlled Substance Utilization Review and Evaluation System (CURES) database[5] to determine whether patients had current or prior prescriptions for controlled substances from other doctors. Tseng routinely wrote prescriptions for opioids (such as oxycodone, oxymorphone, fentanyl, and hydrocodone ),[6] sedatives *198 (such as promethazine and *121 benzodiazepine),[7] muscle relaxants (such as carisoprodol, which is sold under the brand name Soma®), and amphetamines, as well as controlled substances used to treat drug and opioid addictions (such as methadone and buprenorphine /naloxone ).[8] Tseng sometimes allowed patients to pick up prescriptions for other patients who were not at the clinic. The evidence presented at trial showed that on at least one occasion Tseng prescribed a patient's relative, who had never been Tseng's patient, a controlled substance. Tseng acknowledged that some patients, who presented symptoms suggesting opioid and drug addiction and withdrawal, were merely seeking drugs.
C. Investigations of Tseng's Practice
Beginning in 2008, pharmacists began to refuse to fill prescriptions written by Tseng because the prescriptions raised "red flags"; the patients' profiles, conduct, and the combination of substances and quantities Tseng prescribed indicated no legitimate medical purpose for writing the prescriptions. When Tseng learned of this, she referred her patients to "mom and pop" pharmacies, which continued to fill her prescriptions. That same year, law enforcement investigators, including investigators from the coroner's office, began calling Tseng to discuss the deaths of several of her patients and to apprise her that the patients had died of suspected drug overdoses shortly after obtaining prescriptions from her. Once she became aware of the deaths, she entered "alerts" in some of the patients' records indicating that they had died from a possible drug overdose. She also altered[9] patient records but continued her prescribing practices until she was arrested in 2012.
In 2010, the DEA and California Department of Justice (DOJ) investigated Tseng for diversion of drugs. DEA agents executed a search warrant at Tseng's medical group. Agents seized computers and created digital copies of her computer files. In 2012, the Medical Board of California (the Medical Board) also executed a search warrant on Tseng's medical group, seizing *122 patient records. Evidence produced during the investigation revealed that from 2007 through 2010, the clinic's gross receipts were approximately $5,000,000.
D. Tseng's Patients' Overdose Deaths
In July 2012, Tseng was arrested and charged with three counts of second degree murder (§ 187 (count 1, Vu Nguyen; count 2, Steven Ogle; and count 4, Joseph Rovero) ), 20 counts of unlawfully prescribing controlled substances to patients ( Health & Saf. Code, § 11153, subd. (a) (count 3 & counts 5-23) ), and one count of obtaining a controlled substance by fraud ( Health & Saf. Code, § 11173, subd. (a) (count 24) ).
*199 At trial, the prosecution presented evidence that from September 2007 to December 2009, nine of Tseng's patients-ranging from 21 to 34 years of age-died shortly after filling the prescriptions Tseng wrote them for controlled substances.
1. Murder charges
a. Death of Vu Nguyen (count 1-second degree murder) in 2009
In early February 2009, Tseng prescribed 28-year-old Nguyen the sedative Xanax®, and the opioids Norco® and Opana®.[10] Nguyen died several days later of a drug overdose. Nguyen's family did not believe he suffered from any medical condition that required him to take painkillers. The Orange County Coroner's Division conducted Nguyen's autopsy and determined the cause of his death was the combined effects of Opana® and Xanax®, although he had methadone in his system as well.[11]
On March 9, 2009, the coroner's investigator contacted Tseng to discuss Nguyen's death. Tseng told the investigator she started treating Nguyen on August 9, 2008, for back and neck pain. She prescribed the opioid Norco® and sedative Xanax®.[12] Two weeks later, Nguyen returned and said he had taken all of the medication because the pain was "too much." Tseng wrote him a refill prescription. Although Tseng claimed she told Nguyen she would not write refill prescriptions for his medications "early" again, she failed to discuss with him the potential health risks of Norco® and Xanax®. Nguyen *123 returned to Tseng at the beginning of November 2008 and said the medications were not working. Tseng prescribed the opioid Opana®, which is three times stronger than Norco®, and wrote him a refill prescription for Xanax®. During that visit, Nguyen also told Tseng that he had Attention Deficit Disorder and reported he was having trouble concentrating. Tseng did not attempt to corroborate the diagnosis of Attention Deficit Disorder ; nonetheless, Tseng prescribed him Adderall®.[13] Nguyen returned on December 1, and Tseng prescribed Vicodin®,[14] Opana®, and Xanax® for him. Nguyen returned on January 5, 2009, and reported that the Vicodin® was not strong enough. Tseng prescribed Nguyen a higher dose of the opioid Norco®(10 mg, 90 tablets), and gave him refill prescriptions for the opioid Opana®(10 mg, 90 tablets) and the sedative Xanax®(2 mg, 90 tablets). A month later, at Nguyen's last visit, Tseng wrote those refill prescriptions for the same dose and number of pills. Tseng told the coroner's investigator that Nguyen was always seeking more medication and stronger doses.
The prosecution also presented evidence that Tseng did not obtain information from Nguyen to corroborate his complaints of pain and anxiety or complete an adequate physical examination to determine whether a legitimate medical reason existed to prescribe the controlled substances. In addition, *200 although Nguyen reported to Tseng that he was taking "high doses of opioids" prescribed by other doctors, Tseng did not contact Nguyen's other doctors. Tseng did not obtain medical records relating to Nguyen's prior treatment or a complete medical and mental health history of Nguyen.
Tseng's medical records pertaining to Nguyen showed that Tseng had not provided a treatment plan for Nguyen, nor had she educated him about alternative treatments for his symptoms or the potential risks of the substances she prescribed. In addition, the prosecution presented evidence that Tseng had altered Nguyen's patient records between 2010 and 2012 by filling in information in his records that she had left incomplete while she was treating Nguyen.
The prosecution's medical expert testified that Tseng's treatment of Nguyen represented an extreme departure from the standard of medical care.
b. Death of Steven Ogle (count 2-second degree murder; count 3-unlawful prescription) in 2009
Steven Ogle, who lived in Palm Springs, sought treatment from Tseng in early March 2009, complaining of pain caused by a car accident that had *124 occurred several years before. According to Tseng's patient records for Ogle, during his first visit to Tseng's clinic on March 2, 2009, he told Tseng he was taking six to eight OxyContin® tablets (80 mg) per day,[15] using heroin, and that he wanted to take methadone. Tseng did not ask who had prescribed Ogle the OxyContin®. Even though Tseng was not an addiction specialist licensed to prescribe and monitor the use of methadone, she wrote Ogle prescriptions for methadone (10 mg, 100 tablets) and Xanax®(2 mg, 100 tablets).[16] Ogle returned to the clinic two weeks later on March 17, 2009, having used all of the medication and suffering from symptoms of withdrawal. Tseng wrote refill prescriptions for Ogle. On April 7, again having used all the medications prescribed on March 17 and suffering from withdrawal symptoms, Ogle returned to the clinic for more prescriptions. Tseng again prescribed Xanax®(2 mg, 100 tablets) and methadone (10 mg, 100 tablets). Ogle died two days later. Investigators found three bottles of prescription medication near Ogle's body. Tseng had written prescriptions for two of these only two days earlier: methadone, 100 tablets (7 remaining) and Xanax®, 100 tablets (15.5 remaining). The third bottle, containing OxyContin®, had been prescribed in January 2009 by another doctor. The coroner opined that Ogle died of "methadone intoxication."
In early May 2009, a coroner's investigator called Tseng regarding Ogle. Tseng confirmed that Ogle's first visit was in March 2009, about a month before his death. She said that Ogle reported he was abusing OxyContin® and wanted her help to stop, and therefore she prescribed methadone *201 and Xanax®. Tseng said she saw Ogle again two weeks later and wrote him refill prescriptions. Tseng confirmed he returned in early April and she wrote Ogle refill prescriptions again. She claimed that she told Ogle not to take methadone with other opioids.
The prosecution presented expert medical testimony that Tseng's method of treatment of Ogle represented an extreme departure from the standard of care in various ways, including that Tseng was not a licensed addiction specialist and did not have the training to monitor Ogle's use of methadone.
*125 c. Death of Joseph Rovero (count 4-second degree murder; count 5-unlawful prescription) in 2009
In 2009, Rovero was a 21-year-old student at Arizona State University, who traveled from Arizona seeking treatment at Tseng's clinic. Tseng saw Rovero only once, on December 9, 2009, to treat his complaints of back pain, wrist pain, and anxiety. Rovero informed Tseng he had been using high doses-six pills (150 mg to 200 mg) of OxyContin® and Xanax® and the muscle relaxant Soma®-every day and requested the same prescriptions. Tseng prescribed him the opioid Roxicodone®(30 mg, 90 tablets), Soma®(350 mg, 90 tablets), and Xanax®(2 mg, 30 tablets). Nine days later, when Rovero died of a drug overdose, empty bottles of medications prescribed by Tseng were found near his body. The coroner in Arizona investigating Rovero's death found the cause of death was combined drug toxicity, including alcohol,[17] prescription opioids, muscle relaxants (Soma®), and a sedative (Xanax®).
When investigators questioned Tseng about Rovero's death, she admitted treating Rovero and knowing that he had been using opioids, sedatives, and muscle relaxants prescribed by other doctors. She told investigators that she believed Rovero was taking an inappropriate amount of OxyContin®. Consequently, she prescribed Roxicodone® instead, as well as Xanax® and Soma®. Her stated goal was to wean Rovero from opioids. Tseng did not, however, verify the doses or the types of medications that Rovero claimed other doctors had previously prescribed him. Tseng reduced the doses of all three drugs Rovero reported taking by 80 percent, which, according to the evidence presented at trial, guaranteed he would suffer from withdrawals. The prosecution's expert explained that when an individual has been abusing pain medications by taking high doses of the medications-as Rovero was-any efforts to "wean" the person from those drugs require a gradual reduction in dosing; otherwise, the individual might experience symptoms of drug withdrawal that place the individual at risk of overdose or death. The prosecution also presented evidence that the prescriptions Tseng wrote for Rovero likely increased his potential for overdose and death because Tseng failed to verify the doses of the drugs he had been previously prescribed.
2. Uncharged deaths of Tseng's patients
During the trial, in addition to the deaths of Nguyen, Ogle, and Rovero, the prosecution presented evidence of the following six uncharged deaths of Tseng's patients from prescription drug overdoses between late 2007 and 2009: Matthew *202 Stavron, Ryan Latham, Nathan Keeney, Joshua Chambers, Joseph Gomez, and Michael Katnelson. *126 Specifically, with respect to patient Stavron, who died in 2007, Tseng prescribed to him, among other drugs, OxyContin®(80 mg). During the DEA's investigation of Tseng's practice, she told an undercover DEA agent that an 80 milligram prescription of OxyContin® is "super high." She was also aware that OxyContin® is primarily prescribed only to treat pain from broken bones or cancer, and that Stavron did not suffer pain from broken bones or cancer. Two days after Tseng wrote Stavron a prescription for OxyContin®, he died from an overdose of that medication. When the coroner's investigator called Tseng to discuss Stavron's death, she told the investigator that Stavron was drug-seeking.
Tseng's patients Latham and Keeney died in 2008. Tseng had prescribed Latham Norco®(10 mg, 150 tablets), in addition to other drugs. As Tseng told an undercover DEA agent, Norco® is addictive and "evil." Two days after Tseng wrote Latham the prescription, he died from a Norco® overdose. During a call with the coroner's investigator, Tseng described the number of Norco® pills Latham took per day and characterized him as a "drug-seeker."
Tseng prescribed Keeney OxyContin®(80 mg, 60 tablets). There was no indication that Keeney had broken bones or cancer. Tseng also prescribed to him methadone (10 mg, 100 tablets). Four days after filling the prescriptions from Tseng, Keeney died from a methadone and OxyContin® overdose. Tseng told the coroner's investigator that Keeney had "somewhat drug-seeking behavior."
Tseng was aware of Stavron's and Latham's overdose deaths before she started treating murder victim Nguyen, and learned of Keeney's death while she was treating Nguyen. In addition, by the time that murder victim Ogle died in April 2009, Tseng had also learned of Nguyen's death.
In 2009, Tseng's patients Chambers, Gomez, and Katnelson[18] also succumbed to drug overdoses. Specifically, concerning Katnelson, Tseng prescribed him fentanyl (10 of the 75 mcg- per-hour patches). Fentanyl is an opioid 100 times more potent than morphine. Katnelson died the day after he filled the prescription from Tseng. Tseng told the coroner's investigator that she did not know Katnelson well enough to know whether he was abusing the medication.
Tseng prescribed Chambers, among other drugs, Norco®(10 mg, 100 tablets); Chambers died three days later. The coroner determined Chamber's cause of death was a combination of drugs, including Norco®. Tseng told the *127 coroner's investigator that Chambers appeared to be drug-seeking because he finished his drugs early and because his insurance company apprised her that Chambers was seeking medication from other doctors. She also reported that she suspected Chambers was abusing alcohol.
Tseng prescribed Gomez, among other drugs, the opioid Roxicodone®(30 mg, 90 tablets) and Xanax®(2 mg, 100 tablets); two days later, Gomez died. The coroner determined he died of a combined intoxication, including Roxicodone® and Xanax®. Tseng told the coroner's investigator that Gomez attempted to get medication from other doctors.
Tseng learned of the drug overdose deaths of Chambers, Gomez, Katnelson, *203 and Ogle before she began treating murder victim Rovero in December 2009.
Similar to the deaths of the patients in the charged murder counts-Nguyen, Ogle, and Rovero-the six uncharged patient deaths of Stavron, Latham, Keeney, Chambers, Gomez, and Katnelson all occurred within days after Tseng wrote them prescriptions for high doses of opioids, sedatives, or other drugs. These patients-Stavron, Latham, Keeney, Chambers, Gomez, and Katnelson-also fit the same patient profile as Nguyen, Ogle, and Rovero. They were in their 20's or early 30's, and Tseng knew they were drug-seeking and drug-abusing. Tseng treated some of these patients only once while others returned several times; each time, Tseng prescribed high doses of controlled substances. Moreover, after the coroner's investigators contacted Tseng to inform her when each patient had died from a drug overdose, Tseng entered an "alert" in the clinic's computer records for some of those patients, indicating the patient had died from a possible drug overdose. A comparison of the patient records seized in 2010 and 2012 also showed that Tseng had altered patient records, while she was under investigation, by completing records that had been previously left blank or incomplete.
Even after Tseng learned of these deaths, she continued to prescribe high doses of controlled substances, including opioids, sedatives, and in some cases, methadone to other patients.
A jury found Tseng guilty of three counts of second degree murder, 19 counts of unlawfully prescribing controlled substances, and one count of obtaining a controlled substance by fraud. The trial court sentenced her to 30 years to life in state prison. Tseng filed a timely notice of appeal.
*128 DISCUSSION
I. Substantial Evidence Supports Tseng's Second Degree Murder Convictions
Tseng contends that substantial evidence does not support her convictions of second degree murder of Nguyen, Ogle, and Rovero because there was no evidence that she acted with implied malice, and, in the case of Nguyen and Rovero, no evidence that her conduct was the proximate cause of their deaths. She argues that although she acted with negligence sufficient to support convictions for involuntary manslaughter, there was no evidence that she acted with conscious disregard for her patients' lives. Specifically, she asserts that because coroner and police investigators never informed her that she was responsible for the victims' deaths or the deaths of other patients, her continued practice of prescribing high doses and large quantities of opioids and other controlled substances did not show the necessary reckless mindset to support a finding of implied malice.
We review the evidence in the light most favorable to the verdicts, presuming the existence of every fact the trier could have reasonably deduced from the evidence. ( People v. Johnson (1993) 6 Cal.4th 1, 38, 23 Cal.Rptr.2d 593, 859 P.2d 673, overruled on other grounds by People v. Rogers (2006) 39 Cal.4th 826, 48 Cal.Rptr.3d 1, 141 P.3d 135.) We apply the same standard to our review of circumstantial evidence. ( People v. Ceja (1993) 4 Cal.4th 1134, 1138, 17 Cal.Rptr.2d 375, 847 P.2d 55.) As set forth below, we conclude that substantial evidence supports the jury's verdict.
A. Evidence of Implied Malice
Implied malice exists when an intentional act naturally dangerous to human life is committed " 'by a person who knows that his conduct endangers the life of another and who acts with conscious *204 disregard for life.' " ( People v. Lasko (2000) 23 Cal.4th 101, 107, 96 Cal.Rptr.2d 441, 999 P.2d 666, quoting Pen. Code, § 188.) "It is the ' " 'conscious disregard for human life' " ' that sets implied malice apart from gross negligence."[19] ( People v. Contreras (1994) 26 Cal.App.4th 944, 954, 31 Cal.Rptr.2d 757.) "Implied malice is *129 determined by examining the defendant's subjective mental state to see if ... she actually appreciated the risk of ... her actions." ( People v. Superior Court (Costa) (2010) 183 Cal.App.4th 690, 697, 107 Cal.Rptr.3d 576 ( Costa ); see People v. Olivas (1985) 172 Cal.App.3d 984, 988, 218 Cal.Rptr. 567 ["[T]he state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' "].) "Implied malice may be proven by circumstantial evidence." ( Costa , supra , 183 Cal.App.4th at p. 697, 107 Cal.Rptr.3d 576 ; see People v. Nieto Benitez (1992) 4 Cal.4th 91, 110, 13 Cal.Rptr.2d 864, 840 P.2d 969 ["Even if the act results in a death that is accidental ... the circumstances surrounding the act may evince implied malice."].)
The record discloses overwhelming evidence that Tseng's treatment of Nguyen, Ogle, Rovero, and other patients was well below the standard of care in the practice of medicine and prescribing opioid medications. We recognize that, although probative of Tseng's subjective appreciation of risk, a departure from the medical standard of care alone would not be sufficient to support an implied malice finding. (See People v. Klvana (1992) 11 Cal.App.4th 1679, 1703-1705, 15 Cal.Rptr.2d 512 [even though the evidence showed that doctor's treatment of patients fell below the standard of care, his second degree implied malice murder convictions were affirmed not based on the evidence of the doctor's negligence but, instead, because sufficient evidence demonstrated doctor's actual awareness and conscious disregard of the life-threatening dangers of his treatment of patients].) As noted above, to sustain an implied malice murder conviction, there must be substantial evidence that Tseng subjectively appreciated the risk to her patients of her opioid prescription practices. Here, substantial evidence supports the jury's finding that Tseng acted with a subjective appreciation of the risks involved in her medical treatment of Nguyen, Ogle, and Rovero.
As a licensed physician, Tseng had expert knowledge of the life-threatening risk posed by her drug prescribing practices. She knew that the drugs she prescribed were dangerous and that the combination of the prescribed drugs, often with increasing doses, posed a significant risk of death. Tseng's experience and medical training regarding opioids and other controlled substances endowed her with special knowledge of those dangers. During the investigation of her practice, Tseng admitted to undercover DEA agents that she understood that the drugs she was prescribing were addictive and typically would only be prescribed to treat pain from cancer and broken bones. She knew that she was prescribing those drugs in high doses *205 and in dangerous combinations to patients who did not suffer from those conditions. *130 Tseng also took other actions that showed her awareness of the danger of her prescribing practices. After larger pharmacies, such as CVS and Walgreens, contacted Tseng to raise questions about the lack of medical justification for her prescriptions, and ultimately refused to fill those prescriptions, Tseng sent her patients to small "mom and pop" pharmacies which she knew would continue to fill her prescriptions. Moreover, although she knew some patients were also obtaining similar prescriptions from other doctors and were taking drugs in lethal combinations, Tseng did not contact those other doctors to determine which drugs other doctors had prescribed or in what doses and when; nor did she check the CURES database for that information. Rather, Tseng told patients-some of whom she knew were addicted to prescription pain medication-not to mix the drugs.
There is substantial evidence of Tseng's subjective awareness of the risk of death her prescribing practices posed to the three charged murder victims. Concerning Nguyen, the evidence showed that from his initial visit, Tseng knew that Nguyen was drug-seeking and that he was taking high doses of opioids prescribed by other doctors. Nonetheless, she failed to corroborate his complaints of pain and anxiety, contact his other doctors, or do the kind of physical examination required to determine whether a legitimate medical reason existed for prescribing the drugs he requested. Instead, Tseng prescribed to Nguyen opioids and sedatives, and when he returned two weeks later having used up all the medications, she simply wrote him refill prescriptions. According to Tseng, during the second visit, she told Nguyen that she would not write him a prescription for his medications "early" again. She failed, however, to discuss with him the severe health risks of those combined medications. After that, Nguyen returned almost every month until his death in February 2009 seeking more medication in higher doses. Tseng wrote him refill prescriptions without further inquiry into the need for those refills, let alone in higher doses. A reasonable jury could infer from this evidence that Tseng was aware Nguyen was abusing the opioids and sedatives she had prescribed, and that by continuing to prescribe the drugs in greater amounts and stronger doses, Tseng acted in conscious disregard for his life.
In addition, even while Tseng was treating Nguyen, she learned of the deaths of other patients-Stavron, Latham, and Keeney-who had similar patient profiles. They, like Nguyen, were otherwise healthy, young men seeking prescriptions for controlled substances and willing to pay cash, who died of drug overdoses shortly after Tseng treated them. They also expressed vague complaints about pain and reported taking prescription opioids and sedatives. Tseng admitted she knew that many of these patients were drug-seeking and had presented with symptoms of drug addiction when she prescribed controlled substances to them. She told her receptionist that her patients were "druggies." She, nonetheless, continued to prescribe high doses of opioids, sedatives, and muscles relaxants without performing adequate *131 physical examinations of these patients and without corroborating their claims of pain and prior injuries. When these patients returned for subsequent visits and sought to refill the prescriptions, Tseng complied and sometimes wrote them prescriptions for stronger medications, again with no medical justification.
Substantial evidence further supports that Tseng acted with implied malice when treating Ogle. At his first visit in March *206 2009, Ogle told Tseng that he was taking extremely high doses of OxyContin®-in amounts used to treat terminal cancer patients-and using heroin daily. Rather than investigate this report of Ogle's drug use and prior treatment, Tseng prescribed him 100 tablets each of Xanax® as well as methadone-a drug she knew she was not licensed or trained to prescribe. Ogle then returned twice in the next month having used all the medications Tseng had prescribed. During those visits, he informed Tseng that he had taken all the medications and wanted refill prescriptions, and Tseng observed that Ogle was suffering from symptoms of withdrawal from drugs. Tseng did not, however, refer him to an addiction specialist. Instead, Tseng just wrote him refill prescriptions. From this evidence, and from the evidence that at the time Tseng was treating Ogle she was aware of the deaths of her patients Stavron, Latham, Keeney, and Nguyen, the jury could reasonably have found that Tseng acted with implied malice in treating Ogle.
Substantial evidence also supports that Tseng acted with implied malice in treating Rovero. By the time she prescribed drugs for Rovero in December 2009, Tseng knew that eight of her patients (Stavron, Latham, Keeney, Chambers, Gomez, Katnelson, Nguyen, and Ogle) had died shortly after she had prescribed the types of drugs Rovero sought. Even armed with this knowledge, she continued to prescribe dangerous drugs in conscious disregard for Rovero's life. Specifically, Rovero presented to Tseng as using extremely high doses of OxyContin®, Xanax®, and the muscle relaxant Soma® every day. Tseng did not, however, verify the doses or the types of medications that other doctors had previously prescribed to Rovero. Instead, Tseng substituted one brand of opioid (OxyContin®) for another (Roxicodone®) and prescribed Xanax® and Soma® in reduced doses, which, according to the evidence presented at trial, guaranteed Rovero would suffer from withdrawals and raised his potential for overdose and death.
Our conclusion that substantial evidence supports a finding of implied malice with respect to each of the charged murders is not unprecedented. Our research has uncovered three cases-a federal case applying New York law and cases from California and Michigan-in which appellate courts addressed the sufficiency of evidence to support convictions of second degree murder or similar charges, requiring evidence of recklessness or conscious disregard of life, stemming from a licensed physician's treatment of a patient.
*132 Thus, in Einaugler v. Supreme Court of State of N.Y. (2d Cir. 1997) 109 F.3d 836, a medical doctor was charged under the New York Penal Code with reckless endangerment and willful patient neglect in connection with the death of his patient. The prosecution presented evidence that he endangered his patient, who was in a nursing home, when he prescribed that she be fed through her dialysis catheter instead of her feeding tube, and then engaged in willful neglect by delaying the patient's hospitalization, despite being told by other doctors that prompt treatment of the patient in a hospital was necessary. ( Id . at pp. 840-841.) Although the doctor was not charged with second degree implied malice murder, the reckless endangerment charge against him required proof, as in Tseng's case, of the doctor's subjective awareness of the danger of his treatment. ( Id . at p. 840.)
After the state appellate court affirmed the doctor's conviction, the doctor filed a petition for a writ of habeas corpus in the federal district court challenging the sufficiency of the evidence supporting his conviction.
*207 In denying the petition, the district court observed "[t]he reckless endangerment charge required proof that [the doctor] had recklessly engaged in conduct that created a substantial risk of serious physical injury. [New York] Penal Law [section] 120.20. For [the doctor's] act to be reckless, he must have grossly deviated from a reasonable person's standard of conduct and consciously disregarded a substantial and unjustifiable risk. See [New York] Penal Law [section] 15.05." ( Einaugler v. Supreme Court of State of N.Y. , supra , 109 F.3d at p. 840, italics omitted.) The district court concluded that the doctor's convictions were supported by "sufficient" evidence. The court observed that the doctor knew of the dire health condition in which his directions had placed his patient, had been directed to hospitalize his patient immediately once she showed signs of distress, and was aware of the serious health risk if she was not transferred promptly. He nevertheless waited 10 hours before transferring her to a hospital. ( Ibid . )
Our opinion in People v. Klvana , supra , 11 Cal.App.4th 1679, 15 Cal.Rptr.2d 512 also supports our conclusion that substantial evidence supports the jury's finding of Tseng's implied malice. In that case, we affirmed a medical doctor's convictions of second degree murder for the deaths of nine infants. We concluded that a reasonable jury could have found implied malice to support the murder convictions based on the following evidence: The defendant repeatedly ignored obvious signs of medical distress in his patients during delivery; he advised parents not to take their children to the hospital despite clear indications of the need to do so; he induced vaginal births in inappropriate circumstances, after having been warned on numerous occasions that his treatment was dangerously substandard; and he continued to deliver babies despite the fact that his hospital privileges had been suspended because of substandard performance. ( Id. at pp. 1704-1705, 15 Cal.Rptr.2d 512.) Further paralleling the facts here, in Klvana, the prosecution presented evidence of an uncharged baby's *133 death resulting from the doctor's treatment to support the doctor's subjective knowledge of the grave risks of his treatment practices. ( Ibid . )
People v. Stiller (2000) 242 Mich.App. 38, 43, 617 N.W.2d 697 ( Stiller ), is also instructive. In Stiller , the Michigan appellate court affirmed the implied malice second degree murder conviction of a doctor who, for a four-month period, prescribed his patient high doses of hydrocodone unrelated to any rational medical treatment. ( Id . at p. 43, 617 N.W.2d 697.) The patient then died from an overdose of drugs, including hydrocodone. ( Id . at p 41, 617 N.W.2d 697.)
In challenging his murder conviction, the doctor argued that "there was no evidence that he actually instructed [his patient] to take a fatal dose of drugs." ( Stiller , supra , 242 Mich.App. at p. 47, 617 N.W.2d 697.) The Stiller court rejected the doctor's argument: "[B]y prescribing huge quantities of medicine unrelated to any rational medical treatment and that had a possibility of interacting with other drugs he prescribed, defendant should have known that an overdose was likely to occur, and he therefore exhibited a wanton and willful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm." ( Ibid . ) The court also supported its decision with evidence that pharmacies had warned the doctor about his dangerous prescribing practices, the doctor had prescribed very high doses of powerful drugs, and he had knowledge that there was no legitimate medical reason for his drug prescription for the murder victim. ( Id. at pp. 43-45, 617 N.W.2d 697.) The same is true here.
*208 Finally, even accepting Tseng's claim that investigators did not expressly inform her that she was directly responsible for the deaths of Nguyen, Ogle, Rovero, or other patients, her conduct, after learning of these deaths, demonstrated she was aware of the lethal consequences of her prescribing practices. For example, Tseng placed "alerts" in the patient files indicating that they died of suspected drug overdoses. She also altered patient records after she learned she was under investigation. From this evidence and other circumstantial evidence in the record, a jury could have reasonably found Tseng knew the cause of Nguyen's, Ogle's, and Rovero's deaths and of her role in their demise. In sum, substantial evidence supports the jury's findings of implied malice.
B. Evidence of Causation
Tseng argues substantial evidence did not support the finding that she caused Nguyen's and Rovero's deaths.[20] We disagree.
*134 Concerning Nguyen, the coroner determined that the cause of his death was the combined effects of Opana® and Xanax®, both prescribed by Tseng. Nguyen also had small amounts of methadone in his system when he died. Tseng argues that the presence of methadone was an "unforeseeable intervening" cause that demonstrates she did not cause his death. Tseng's argument is unavailing because it asks us to reweigh the evidence, which we cannot do. (See People v. Protopappas (1988) 201 Cal.App.3d 152, 168, 246 Cal.Rptr. 915 [appellate court will not reweigh the evidence and draw inferences which the jury rejected].)
Although "an 'independent' intervening cause will absolve a defendant of criminal liability[,] ... the intervening cause must be 'unforeseeable ... an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.' [Citation.] On the other hand, a 'dependent' intervening cause will not relieve the defendant of criminal liability. 'A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is ... normal and reasonably foreseeable ... the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability.' " ( People v. Funes (1994) 23 Cal.App.4th 1506, 1523, 28 Cal.Rptr.2d 758.)
Here, Tseng's medical expert opined that the amount of methadone in Nguyen's system was "pretty small" and alone would not have killed Nguyen. Tseng's expert and the coroner's investigator agreed that the medications Tseng prescribed to Nguyen were contributing causes of his death. Thus, even if methadone played a role in Nguyen's death, the jury could have reasonably concluded that the presence of methadone was not an unforeseen, independent intervening event that would relieve Tseng of liability for Nguyen's death.
Likewise, there was substantial evidence that Tseng's actions were a proximate cause of Rovero's death. Tseng prescribed Rovero Roxicodone®, Soma®, and Xanax®. The coroner found that the cause of Rovero's death was the combined drug toxicity from alcohol and the drugs Tseng had prescribed. Evidence was also presented that the amount of alcohol in his system could not have been lethal. The jury could have reasonably inferred from this evidence that alcohol was not an independent *209 intervening cause of Rovero's death.
II.-VII.**
*135 DISPOSITION
The judgment is affirmed.
We concur.
CHANEY, J.
BENDIX, J.

All statutory references are to the California Penal Code unless otherwise indicated.

This case involved a six-week trial on two dozen criminal charges relating to Tseng's medical practice and prescriptions of controlled substances. We include only the facts and evidence relevant to the issues on appeal.

Tseng also charged $5 to "split" a prescription. "Splitting" is a practice of writing a prescription on two different prescription forms so that a patient could fill the prescription on different dates or at different pharmacies.

It appears that the clinic's earnings grew during this time because of the increase in fees charged for services and in the number of patients treated on a daily basis.

CURES collects prescription dispensation information for all controlled substance prescriptions written in the State of California for individual patients. By referring to the CURES database, a doctor may determine when and from whom a particular patient has obtained a prescription for a controlled substance. This can reveal whether the patient may be abusing controlled substances by obtaining prescriptions for the same drug from multiple doctors.

Branded formulations of oxycodone are sold under the brand namesOxyContin® or Roxicodone®; branded formulations of oxymorphone are sold under the brand namesOpana® or Opana ER®; and branded formulations of the drug hydrocodone are sold under the brand namesNorco®, Vicodin®, or Lortab®.

Tseng prescribed a benzodiazepine drug sold under the namesalprazolam and Xanax®.

The United States Drug Enforcement Agency (DEA) had not licensed Tseng to prescribe drugs to treat addiction.

During this period, the clinic began using digital patient records that allowed Tseng to enter medical information, including "alerts" in a patient file to convey information to a receptionist about a patient. According to G.R., until authorities began investigating the clinic and requesting information about Tseng's patients, many patient records were incomplete or blank. In fact, the digital copies of medical records obtained in 2010 by law enforcement from Tseng's office computers contained few exam notes for patients who had died from drug overdoses; however, the same records seized by authorities in 2012 for the same office visits revealed extensive exam notes, indicating that Tseng had altered the records while she was under investigation.

On February 7, 2009, Tseng prescribed Nguyen: Xanax®(2 mg, 90 tablets); Norco®(10 mg, 90 tablets); and Opana®(10 mg, 90 tablets).

Tseng never prescribed Nguyen methadone.

The record does not contain evidence of the doses or number of pills of Norco® or Xanax® that Tseng initially prescribed Nguyen.

Adderall® is the brand name of an amphetamine drug commonly prescribed to treat the symptoms of Attention Deficit Disorder.

The opioid Vicodin® is a hydrocodone opioid of the same degree of strength as the hydrocodone opioid Norco®.

According to expert testimony presented at trial, an 80 milligram dose of OxyContin® is an amount typically prescribed to a terminal cancer patient. There was no evidence Ogle was suffering from cancer.

Ogle's sister-in-law accompanied him on visits to the clinic. She testified it was her belief that at Ogle's first visit on March 2, 2009, Tseng prescribed Ogle: OxyContin®, Xanax®, and the sedative promethazine. She also testified that at Ogle's second visit in mid-March, she believed that Tseng wrote refill prescriptions and also prescribed methadone. Tseng's patient records for Ogle do not indicate that she prescribed him OxyContin® or promethazine. Likewise, when Tseng spoke to the coroner's investigator in May 2009, after Ogle's death, Tseng did not mention prescribing Ogle OxyContin® or promethazine.

The amount of alcohol in Rovero's blood at the time of his death was a non-lethal amount.

Tseng was charged with issuing unlawful prescriptions with respect to Chambers (count 8), Gomez (count 10), and Katnelson (count 13).

Second degree murder (based on implied malice) and involuntary manslaughter both involve a disregard for life. For murder, however, the disregard is judged by a subjective standard, whereas for involuntary manslaughter, the standard is an objective one. (People v. Watson (1981) 30 Cal.3d 290, 296-297, 179 Cal.Rptr. 43, 637 P.2d 279.) Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. (Ibid . ) In contrast, involuntary manslaughter merely requires a showing that "a reasonable person would have been aware of the risk." (Id. at p. 297, 179 Cal.Rptr. 43, 637 P.2d 279.)

On appeal, Tseng does not contest that there was substantial evidence of causation with respect to Ogle's death.

See footnote *, ante .