Filed 8/19/22 In re J.J. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. C.L., Defendant and Appellant. | G061099 (Super. Ct. No. 20DP0565) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Isabel Apkarian, Judge. Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearances for the Minor.

## INTRODUCTION

Appellant C.L., a young mother, struggles with drug addiction. In early 2020, her one-year-old baby boy, J.J., was taken into protective custody over fears that C.L. and J.J.'s father, William J., were unable to properly care for the child due to their drug abuse and associated criminal history. C.L. was offered reunification services but did not fully engage in them. She continued to battle her addiction throughout the pendency of the case, all the while denying it posed any significant risk of harm to J.J. The juvenile court disagreed, terminated her parental rights, and chose adoption as J.J.'s permanent plan.

C.L. believes the court should have found a significant emotional bond existed between she and J.J., the termination of which would be detrimental to him. But we cannot quarrel with the juvenile court's judgment. The sad fact is C.L.'s substance abuse problem not only posed a continuing danger to J.J.; it also prevented him from being able to adequately bond with his mother. We therefore affirm.

## FACTS

In March 2020, Orange County Social Services Agency (SSA) received a report that J.J. had been left by William in the custody of his paternal aunt, Shelby J., when William went to jail. Shelby had already had one child removed from her custody, and the whereabouts of J.J.'s mother, C.L., were unknown, so SSA applied to take J.J. into protective custody for his own safety and welfare. Both William and C.L. had long-standing unresolved drug abuse problems involving methamphetamine and heroin, and

2

criminal records (an extensive one in William's case) as a result.[1] SSA filed a dependency petition for J.J. on May 11, 2020.

At the detention hearing on May 13, 2020, the juvenile court gave both William and C.L. a minimum of eight hours of monitored visitation per week and unlimited video chats. A child and family team meeting was held and the parents agreed to attend monitored visits with the child together every Tuesday and Thursday from 1:00 to 5:00 p.m. SSA recommended C.L. participate in outpatient drug treatment, a parent education program, individual counseling, and random drug testing starting on May 23, 2020.

J.J. was placed with his paternal grandmother, Vicki M. In the interim, C.L. was consistently attending a parent education program, and she appeared for most of her drug tests. However, she tested positive for opiates on August 7, 2020.[2]

The jurisdictional hearing took place on September 17, 2020, at which time C.L. and William entered no contest pleas as to count two of the petition, agreeing J.J. came within the provisions of section 300, subdivision (b)(1) of the Welfare and Institutions Code.[3] The court found the section 300, subdivision (b)(1) allegations true and set a contested disposition hearing for later that month.

C.L. testified at the disposition hearing, and said she had been attending her parenting classes, pursuing therapy[4], and appearing for drug tests. But she conceded she had not yet entered into a drug treatment program.[5] And she was prepared to accept

---

[1] William passed away in late January 2021, and thus, we focus only on C.L. for purposes of this appeal.

[2] At the disposition hearing, C.L. testified her drug test was positive because she had sought treatment for another medical condition and was administered medication containing codeine.

[3] All further statutory references are to the Welfare and Institutions Code.

[4] She attended several sessions but then was a no-show for several appointments, which led to therapy services being terminated for lack of participation.

[5] She claimed she was ineligible because she was then sober.

3

William back in her home once he was released from prison. She did not think he posed any risk to her children even though he had a significant substance abuse problem.[6]

The court was very concerned about C.L.'s failure to appreciate her own problems, and William's as well, and how they impacted her ability to adequately protect J.J. Not only was C.L. ready to once again cohabit with William, she was also making herself susceptible to addiction triggers. J.J. was ordered removed from C.L. and the court kept her supervised visitation at eight hours per week, while also ordering SSA to use best efforts to ensure C.L. could visit concurrently with J.J. and her older son. C.L.'s ability to visit with the children was conditioned on her not using or being under the influence of any intoxicating substances at the time of the visit. She was also required to confirm each visit one hour beforehand.

C.L. consistently attended her supervised visitation, and her mother, Lisa, who monitored the visits, said J.J. cried when he had to end the visits.

Her drug testing was another story. She missed six drug tests between August and December 2020. But William's death in January 2021 appeared to be a turning point for her. At the time of his death, he had 27 baggies of fentanyl on his person, and social workers noted he had been living with C.L. at the time.

His death hit C.L. very hard, and she missed another five drug tests between January 27 and February 26, 2021. Even after being advised by her social worker that missed tests were treated as positive ones, she missed a test. Additionally, her February 13 test came back positive for fentanyl, the very substance William had been carrying. SSA still believed C.L. was in denial about her drug problem, and wanted to continue her reunification services. But oddly, even though the social worker was concerned about C.L.'s grief compromising her ability to stay sober, she did not

---

[6] C.L. had an older son by a different father who was removed from her care around the time J.J. was taken into custody. The older child is not a party to this appeal.

recommend C.L. obtain any grief counseling or other assistance in dealing with the shock of William's death.

In an addendum report dated May 3, 2021, SSA stated C.L. had tested positive for fentanyl six times and missed two other tests in March 2021 and had also missed nine tests the following month. C.L. ceased drug testing after being confronted about her positive results. One positive test occurred on the day of a visit with J.J. The social worker was "very concerned" about C.L.'s visits with J.J. because of her drug use.

C.L. continued to deny her substance abuse problem. On April 8, 2021, she told her social worker that a doctor had prescribed fentanyl for her, but would not provide any other details. She also demanded her positive test sample on May 17, 2021, be retested. Her drug counselor did as C.L. desired and it still came back positive for fentanyl, causing the counselor to believe C.L. was "l[ying] to [her] face" about drug use. After this, C.L. was offered, but refused, higher level treatment services and was discharged from her treatment program. She failed to appear for 13 drug tests in May and June 2021.

Meanwhile, J.J. was doing well in Vicki's care, sleeping in his own room in her home across from her bedroom. He was verbal, appeared clean and well-groomed, and enjoyed playing with trucks. He was healthy and required no other services.

By June 2021, C.L. had fallen off the map. She did not respond to calls from her social worker, and was not appearing for court-ordered drug testing. A certified letter from her social worker was stamped "return to sender," and SSA had no other mailing address for C.L.

A half hour before the six-month review hearing on July 16, 2021, SSA filed another addendum report changing its recommendation. It now recommended terminating C.L.'s reunification services and scheduling a selection and implementation hearing under section 366.26. Not only had C.L. dropped out of drug treatment and stopped her testing, she had also stopped visiting J.J. since her mother Lisa had been

removed as a monitor in May.[7] She had not visited with J.J. for over two months, and social workers were unaware of her whereabouts or employment status.

Almost one month after the aforementioned report, SSA became aware of even more concerning information about C.L.'s substance abuse problems. She had been arrested in July of 2020 along with another individual after being discovered with "saleable amounts" of fentanyl. She was charged with possession of a controlled substance with intent to sell. C.L. had not reported this arrest to SSA, and social workers only discovered it while doing a routine search of C.L.'s criminal history over a year after the arrest.

Because C.L. had not been visiting J.J. or earnestly participating in services, and because the court felt she was in denial about her substance abuse problem, it terminated her reunification services on September 3, 2021. A selection and implementation hearing under section 366.26 was set for January 3, 2022. At C.L.'s request, the court appointed Dr. Gerardo D. Canul to perform a bonding study between J.J. and C.L. and report back the results by October 25, 2021.

Between September 2021 and January 2022, C.L. had 13 tests come back positive for fentanyl and she missed two tests without an excuse. She visited J.J. during this period, but on three of those occasions, she tested positive the day of her visit. When confronted with her fentanyl use, C.L. had no cogent response except to say she had to "figure this out." As of December 1, 2021, C.L. was listed as a fugitive with respect to her July 2020 criminal arrest. In its section 366.26 report, SSA expressed concern that J.J. could encounter fentanyl – dangerous even in small quantities – if he continued to have contact with C.L. It recommended C.L.'s parental rights be terminated and J.J. be found adoptable with Vicki, his paternal grandmother, the prospective adoptive parent.

---

[7] An incident occurred on April 8, 2021 when C.L.'s social worker came to observe a visit between C.L., J.J., and C.L.'s older child. Lisa was at the visit and forcefully expressed her view that the dependency case had been brought against her daughter in error, and she told C.L. not to sign her case plan, a recommendation which C.L. followed.

The hearing was continued to February 2022, and in the interim, C.L. tested positive for fentanyl two more times and refused to test once. In an addendum report, SSA noted Dr. Canul felt C.L. and J.J. had a "moderately warm and connected" relationship, but C.L.'s criminal troubles and unaddressed substance abuse might "interrupt" or interfere with her ability to parent J.J. effectively. While C.L. had been visiting J.J. fairly consistently in this timeframe, she had missed two visits and shown up late on more than one occasion.

The hearing was ultimately held on February 1, 2022. C.L. objected to Dr. Canul's bonding study being admitted into evidence and it was excluded by the court. Her social worker testified that she considered the loss of J.J.'s relationship with his mother in the context of how young he was and the substantial portion of his life he had been in care. The court terminated C.L.'s parental rights.

## DISCUSSION

On appeal, C.L. contends the juvenile court should have applied the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i), which requires the juvenile court to terminate parental rights as to an adoptable child unless it "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We do not agree with her.

The California Supreme Court last year clarified the three-part analysis required to determine application of the exception. (*In re Caden C.* (2021) 11 Cal.5th 614, 636-637 (*Caden C.*).)[8] ". . . [T]he parent asserting [the exception] must show, by a preponderance of the evidence three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial positive, emotional attachment to the

_____

[8] The case has generated much new law on the parental benefit exception. We count at least nine published opinions which have issued from the state courts of appeal post-*Caden C.*

7

parent – the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Ibid.*)

The juvenile court in this instance determined the first part of the test – regular visitation and contact – had been met, and so C.L. does not take issue with this aspect of the analysis on appeal. However, the court concluded C.L. had not met her burden to prove the second and third parts of the exception. She had failed to show a beneficial relationship the termination of which would be detrimental to the child when compared with the benefits of a permanent adoptive home.

In making this decision, the court noted J.J. had "spent more than half of his life" in Vicki's care, having been an infant when he was detained. Because of this, the court felt, though J.J. referred to C.L. as "Mommy," there was insufficient evidence to show "the kind of attachment that would benefit from a continuing relationship" even taking into account the fact "that there is always a benefit to having a mother."

The court followed *Caden C.*'s advisement to "weigh the relationship with Mom as compared with the security and stability of a new home." Because the child was so young, the court felt he required stability C.L. was unable to give him due to her unaddressed substance abuse: "I don't see any acknowledgment or admission of the use of fentanyl, which is very dangerous, and knowing that there has been at least three visits with [the child] where we have had positive tests is concerning to the court and it's concerning to his safety."

Under *Caden C.*, we review the second prong of the analysis for substantial evidence, and the third prong for abuse of discretion. (*Caden C., supra,* 11 Cal.5th at p. 640.)

## I.          Beneficial Relationship

As the Second District Court of Appeal recently observed in a somewhat analogous case, the second prong of the test can get "complicated." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 317 (*Katherine J.*).) "'[C]ourts often consider how children feel about, interact with, look to, or talk about their parents.' (*Ibid.*) *Caden C.* instructs us that 'it is not necessary—even if it were possible—to calibrate a precise "quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent] provided during [his or] her weekly visits." [Citation.]' (*Ibid.*) Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often 'an important source of information about the psychological importance of the relationship for the child.' (*Id.* at pp. 632-633, fn. omitted.) Ultimately, the court's role is to decide whether the child has a "'significant, positive, emotional relationship with [the parent.]'" (*Id.* at p. 633.)" (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 317.)

The parent need not have overcome the issues leading to dependency for the exception to apply, since it can only be invoked after a parent has failed to reunify with the child. (*See Katherine J., supra,* 75 Cal.App.5th at p. 318.) Nor is it necessary "to show that the parent occupies a parental role in the child's life because a child can have a psychologically or emotionally significant relationship with the parents even if they do not occupy a parental role." (*In re M.G.* (2022) 80 Cal.App.5th 836, 848.) However, a beneficial relationship requires "more than the incidental benefit a child gains from any amount of positive contact with" the parent in visits. (*Katherine J., supra,* 75 Cal.App.5th at p. 318.) When assessing the quality of the parent-child bond, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular

needs.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)

C.L. and J.J. undoubtedly had positive interactions during their visits. C.L. testified J.J. would yell "Mommy" and run to her, telling her he wanted a hug. She would bring him food and play with him. And at the end of visits, he would hug her, kiss her, and the two would do a "secret handshake."

But, as the juvenile court noted, J.J. was very young when he was first detained, and had spent most of his life in his grandmother's care. And even before he was taken into protective custody, C.L. was nowhere to be found. J.J. was dropped off with Shelby, his aunt, by his father, William. The fibers of the relationship between J.J. and his mother had only begun forming after he was removed.

We do not mean to minimize the depth of C.L.'s emotions toward J.J. A mother's love is deeply rooted in the process of carrying her child and bringing him into the world; and for her, the bond is unbreakable. But in this situation, J.J.'s best interests – his feelings toward his mother – are what we must consider. There is no evidence he had formed a significant emotional bond which would warrant requiring him to have continued contact with his mother,[9] so we cannot overturn the trial court's conclusion on this question.

## II.       Detriment Resulting from Termination of Relationship

The third prong of the parental benefit exception requires the court to "decide whether it would be harmful to the child to sever the relationship and choose adoption," and whether such harm "outweighs 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 633, quoting *Autumn H., supra,* 27 Cal.App.4th at p. 575.) Since we have already determined C.L. failed to

---

[9]       SSA also reminds us of C.L.'s request to exclude Dr. Canul's bonding study after she had requested one be performed. Her reticence to rely on the bonding study is "telling, though not dispositive[.]" (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1075.)

10

demonstrate the existence of a significant, positive, emotional attachment between J.J. and herself, it would seem there would be minimal harm to the child from severing his relationship with her. But tipping the scale even further in favor of adoption are C.L.'s continued struggles with substance abuse.

While "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception," the parent's "struggles may mean that interaction between parent and child at least sometimes has a '"negative" effect' on the child." (*Caden C., supra,* 11 Cal.5th at p. 637, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) In J.J.'s case, the juvenile court was quite concerned about the possibility of him being exposed to fentanyl while interacting with C.L. C.L. was unable or unwilling to adequately confront her substance abuse, and had at times tested positive for fentanyl on the day she visited with J.J. The court had appropriate concerns about J.J.'s safety when in her company.[10]

Additionally, C.L. had legal exposure due to her criminal case. At the time of the selection and implementation hearing, the criminal case was still pending. Even more concerning was C.L.'s concealment of her arrest from SSA for approximately one year. She was not transparent about her arrest or her drug use, and we cannot say the court abused its discretion in concluding it could be harmful to J.J. to continue seeing her.

---

[10] "Fentanyl is an opioid 100 times more potent than morphine." (*People v. Tseng* (2018) 30 Cal.App.5th 117, 126.)

## DISPOSITION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


SANCHEZ, J.