Filed 6/23/26  P. v. Starkey CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083173 |
| v. | (Super.Ct.No. INF2201913) |
| AARON MICHAEL STARKEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dean Benjamini, Judge.  Affirmed.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

1

## INTRODUCTION

Defendant Aaron Michael Starkey appeals from convictions for murder (Pen. Code,[1] § 187, subd.(a)), and driving under the influence, causing injury. (Veh. Code, § 23153, subd. (g).)  While driving after an evening of drinking alcohol and using marijuana, Defendant's vehicle veered across the double yellow line, striking one car head on, and causing two other cars to collide while trying to evade head-on contact with Defendant's vehicle.  One person died in the head-on collision.

On appeal, Defendant argues the trial court erred by failing to (1) modify instruction for murder (CALCRIM No. 520) regarding implied malice, and (2) give a pinpoint instruction on the meaning of "conscious disregard" as it pertains to the definition of implied malice for second degree murder.  We affirm.

## BACKGROUND

On June 23, 2022, a little before or after 7:00 a.m., Defendant's Toyota Tacoma pickup truck crossed the center divider into oncoming traffic at 59 miles per hour on Gene Autry Trail in Palm Springs.  Defendant's Toyota Tacoma was traveling northbound.  In the southbound lanes, there were four vehicles:  Christian Fuentes drove a Chevrolet Silverado, and noticed a Toyota Tacoma start veering from the right lane (heading northbound), in Fuentes's direction, as he drove in the left lane heading southbound.  Fuentes swerved to the right to avoid a collision and saw the Toyota Tacoma

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

cross the double yellow lines dividing the roadway and collide head-on with another vehicle, that had been just behind Fuentes.

Erika Avila, driving a Nissan Versa, was driving southbound on Gene Autry Trail in the number 1 lane, behind a black Jeep SUV (sport utility van). The Toyota Tacoma truck was approaching from the opposite direction, and merged into the southbound number 1 lane, and collided with the Jeep SUV that was in front of Avila's vehicle. To avoid the collision with the Toyota Tacoma, Avila tried to move out of the way, swerving to the left.

Diana Macias, in a Nissan Altima, was also driving southbound in the number 1 (left) lane (behind the Nissan Versa, Avila's vehicle), when Macias saw the Nissan Versa brake; Macias also applied her brakes and swerved to the left, into the northbound lane. In the process, Macias collided with Avila, and both vehicles ended up in the desert off the roadway. Avila sustained some injuries from crashing into Macias's car, including an airbag burn, bruised ribs, scratches, and bruising to her face. Once out of her car, Macias saw that the Toyota Tacoma had crashed into a black Jeep that had been driving two cars ahead of hers.

The collision was observed by Maynor Ochoa, who was traveling southbound on Gene Autry Trail, four cars behind a Jeep vehicle.[2] Ochoa saw the Toyota Tacoma, which had been traveling in the northbound lanes, gradually veer towards the cars in front of Ochoa. The Toyota Tacoma collided with the Jeep; and the two vehicles directly in front

---

[2] Witness Ochoa described the SUV as a Jeep Cherokee, but in reality the vehicle was a Jeep Compass, which looks similar to the Cherokee.

of Ochoa (driven by Avila and Macias) swerved to the left and collided with each other, ending up in the desert.

Police arrived on the scene within minutes of receiving dispatches regarding the traffic accident. Officer Stephanie Sandoval was the first to arrive and observed the Jeep Compass in the middle of all four lanes of the roadway, with obvious damage to the front passenger side bumper as well as significant front end damage that wrapped around the vehicle, including the passenger door. A bystander was able to pry open the driver's door of the Jeep Compass so Officer Sandoval could lean into the vehicle to check the driver, victim Joseph Sangenito. At that time, the victim was slumped over the center console, with his head pushed between the glove compartment and the passenger seat, but although he was nonresponsive, he was still breathing.

The fire department had to extricate the victim from his vehicle and he was transported to a hospital by ambulance. The parties stipulated that the victim sustained significant multiple blunt force traumatic injuries which eventually caused his death on September 2, 2022, and that there were no intervening actions or causes of his death.[3]

The Toyota Tacoma was off to the left, on the west side of the road, and the two Nissan vehicles were off to the right.[4] Officer Sandoval saw someone sitting near the

---

[3] The parties entered into several stipulations, which were read into the record. However, they were marked as exhibits and admitted into evidence , so they were not included in the clerk's transcript.

[4] Officer Sandoval approached the accident scene by driving north, so the vehicles that ended up in the desert area, also referred to as the "wash", which she saw on the right side, would have been beyond the shoulder of the northbound lanes, east of the collision.

Toyota Tacoma, who was identified as the Defendant. Officer Jennifer Calleros, who had also responded to the dispatch regarding the collision, observed the Toyota Tacoma (Defendant's vehicle) had front end damage as well as damage to the front passenger bumper and the two passenger doors on the right side of the vehicle. She noted that when a front-end crash occurs, the back of the vehicle angles in. Officer Calleros also saw a tall, 25-ounce can of Michelob Ultra on the west side of the road, which had abrasion marks and a protruding lid, indicating it had opened upon being struck by an external force. The Michelob Ultra can was cool to the touch despite the outside temperature, possibly in the 80's, which caused her to believe the can came from one of the vehicles involved in the collision.

Officer Calleros contacted Defendant, who was sitting on the ground near the Toyota Tacoma, and spoke to him. Defendant indicated he was the driver and sole occupant of the truck. During this contact, Officer Calleros observed objective signs of impairment, including bloodshot red watery eyes, glassy eyes, slow slurred speech. Defendant also appeared to be dazed and disoriented, which could indicate that he had either suffered a head injury in the collision, or was under the influence of a substance. Because of the possibility of a head injury,[5] the officer did not administer field sobriety tests to Defendant.

Officer Calleros also noticed that his tongue was white, pasty in color, with a light green coloration to it, which, along with the glassy eyes, might indicate marijuana use.

---

[5] Defendant did have a significant cut on the back of his head.

Inside the Defendant's truck, Officer Calleros saw an empty container for a cannabis product, and from these and other observations regarding Defendant's appearance, she suspected that drugs or alcohol were involved in the accident. After Officer Calleros made these initial observations, Defendant was transported to the hospital.

At the hospital, Officer Calleros continued her investigation of the collision. After advising him of his *Miranda* rights (referring to *Miranda v. Arizona* (1966) 384 U.S. 436, 467–468), she asked if Defendant had consumed any alcohol or ingested marijuana that day. Defendant initially denied any alcohol or marijuana use. However, he did provide a summary of his actions on the previous day, indicating he had worked as a chef from 11:00 a.m. until 10:00 p.m. and that he had gone to San Bernardino after clocking out, where he went to a bar. He was with a friend at the bar until 1:30 a.m. (June 23, 2022), during which time he consumed three Michelada beers, a beverage containing beer and tomato juice. Then he drove to a friend's house in Cathedral City, where he hung out from about 4:00 a.m. or 5:00 a.m.to 6:00 a.m. on the day of the collision. Then he left to drive home to Desert Hot Springs. Defendant would not answer questions about precise locations where he had been or with whom he had been on the previous evening.

After interviewing the Defendant, Officer Calleros asked Defendant to submit to a chemical test for drugs and alcohol, but Defendant refused after being admonished of the consequences of such a refusal. At this time, Defendant was on a gurney, and the officer was close enough to him to detect the moderate odor of alcohol on his breath. After the officer obtained a warrant, Defendant's blood was drawn and booked into evidence.

The blood sample was analyzed by Bio-Tex Laboratory, and the testing revealed his blood-alcohol content was 0.218 percent, which, after considering Defendant's weight, and the time at which he consumed his last alcoholic beverage, meant that at the time of the collision his blood-alcohol rate would have been 0.293 percent.

The analysis of Defendant's blood also revealed 23.2 nanograms of Delta 9 THC (the psycho-active component of cannabis), which indicated recent use.[6] Also found in the results of the blood analysis were 6.4 nanograms per milliliter of 11-Hydroxy-Delta-9- THC, an active metabolite of Delta 9-THC, as well as 171 nanograms per milliliter of 11-Carboxy-Delta-9-THC, another metabolite of Delta-9-THC which is inactive. According to the forensic toxicologist, cannabis, or marijuana, would have an additive effect when consumed in combination with alcohol.

An accident reconstruction expert examined the Toyota Tacoma to determine if there were any pre-existing mechanical issues that could have contributed to the collision and determined there were none. The expert then obtained data from the airbag module which revealed the vehicle had been traveling at 64 to 65 miles per hour five seconds before the collision, but that it had decelerated to a speed of 59 miles per hour at the time of impact. The pre-crash data revealed there was no braking during the five seconds prior to the collision, and the driver was letting off the accelerator, which was engaged 16 percent at the time of impact. The data also revealed that during the five seconds preceding the collision, there was no active steering, except for a single half-second

---

[6] The parties stipulated to the toxicological results.

interval where there was steering input of approximately 1.5 degrees. In other words, Defendant did not make any attempt to brake or steer the Toyota Tacoma to avoid the collision.

The accident reconstructionist could not obtain any data from the air bag module of the Jeep Compass due to the significant damage to that area of the vehicle. However, the expert was able to calculate the Jeep Compass's speed using data from the Toyota Tacoma and the weights of the two vehicles to determine the unknown speed of the Jeep. This calculation revealed that at the time of the collision, the Jeep's speed was between 20 and 20.74 miles per hour at the time of the collision. Tire friction marks on the roadway revealed that the Jeep was braking at the time of impact.

Defendant was charged by way of a second amended information with murder (§ 187, subd. (a), count 1; victim Sangenito), and driving under the combined influence of any alcohol and drug. (Veh. Code, § 23153, subd. (g), count 2; victim Avila.) Respecting count 1, the information further alleged that probation may not be granted because the Defendant personally inflicted great bodily injury (§ 12022.7) within the meaning of section 1203.075, subdivision (a). It was further alleged that Defendant had been convicted previously of violating Vehicle Code section 23152, subdivision (b), driving under the influence of alcohol, on two separate occasions, in 2009 and 2016. The accusatory pleading also alleged that Defendant had performed unsatisfactorily on probation or parole as an aggravating factor, under California Rules of Court, rule 4.421(b)(5).

Following a jury trial, Defendant was convicted of both counts. The parties stipulated that the admission of the two prior convictions of driving under the influence could be used to establish the truth of the allegations relating to the prior convictions.[7] The court found true the special allegation that Defendant was ineligible for probation pursuant to section 1203.075, subdivision (a). The court found the aggravating circumstances alleged pursuant to California Rules of Court, rule 4.421(b)(2) (Defendant's prior convictions are numerous or of increasing seriousness). However, it found the allegation pertaining to Defendant's unsatisfactory performance on probation or parole to be not true.

The court denied probation and sentenced defendant to an indeterminate term of 15 years to life for count 1, second degree murder, and an upper term of three years for count 2, which was ordered to run concurrent with count 1.

On January 30, 2024, Defendant timely appealed.

## DISCUSSION

### 1. *The Court Did Not Err by Reading the Unmodified Version of CALCRIM No. 520 to the Jury to Define Implied Malice*

Before instructing the jury, the court and counsel discussed whether the jury should be instructed on the elements of implied malice using the language of the modified version of CALCRIM No. 520, which had not yet been adopted at the time of

---

[7] Documents pertaining to the Defendant's two prior convictions for drunk driving were admitted into evidence during the trial, by stipulation , as evidence of uncharged acts to prove Defendant's knowledge that his action was dangerous to human life.

9

Defendant's trial.  The People argued that the court was not required to add the "high degree of probability" language, and both the court and the People noted that although the Judicial Council had drafted the modification of CALCRIM No. 520 including the "high degree of probability" language, the modified instruction had not yet been adopted. The trial court ultimately decided to leave the text of former CALCRIM No. 520 as it was because it was a correct statement of law, and "[t]he Supreme Court says it doesn't incorrectly state the law."

Defendant argues that using the unmodified version of CALCRIM No. 520 requires reversal because the instruction given did not include the language of the recent modification of the instruction, made following the decision by the Supreme Court in *People v. Reyes* (2023) 14 Cal.5th 981, 989.  Asserting that the *Reyes* decision provided a new definition of implied malice, he urges us to find the instructions were prejudicial in failing to instruct the jury that in order to find the Defendant's act was "dangerous to human life" it must find that the Defendant's act "involved a high degree of probability that it would result in death."  (CALCRIM No. 520, as modified Mar. 2024.)  We disagree.

      a.      *General Legal Principles Governing Review of Instructions*

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are

10

necessary for the jury's understanding of the case.' " (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

" 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1112.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998)17 Cal.4th 1216, 1248, citing *People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on a different point by *People v Reyes* (1998) 19 Cal.4th 743, 751.) " ' "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

In determining whether an instruction is ambiguous or misleading, the court considers "the specific language challenged, the instructions as a whole[,] and the jury's findings," as well as counsel's closing arguments to determine whether the instructional error "would have misled a reasonable jury." (*People v. Cain* (1995) 10 Cal.4th 1, 36, 37.) Reversal is not required unless it is reasonably likely the jury misunderstood and misapplied the court's instructions to the defendant's detriment. (*People v. Smithey* (1999) 20 Cal.4th 936, 963–964.)

   b.      *Correctness of CALCRIM No. 520 on Implied Malice*

The court instructed the jury on the elements of murder, reading CALCRIM No. 520, which stated:

11

"The defendant is charged in Count 1 with murder in violation of [section 187]. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant had *express malice* if he unlawfully intended to kill. [¶] The defendant had *implied malice* if: [¶] 1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. [¶] If you find the defendant guilty of murder, it is murder of the second degree."

To establish implied malice in a murder case, the evidence must show that the killing was proximately caused by " ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)

Implied malice contains an objective or physical component and a subjective or mental component. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106 (*Nieto Benitez*).) The physical component concerns whether the act's natural consequences were dangerous to human life. (*Id.* at pp. 106–107.)

The California Supreme Court in *Knoller* acknowledged two lines of decisions that attempt to delineate the objective and subjective components of implied malice. It observed that the first line comes from *People v. Thomas* (1953) 41 Cal.2d 470, 480 (*Thomas*), in the concurring opinion of Justice Traynor, which said malice is implied when " 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*Knoller*, *supra*, 41 Cal.4th at p. 152.)

The second line of cases derives from *People v. Phillips* (1966) 64 Cal.2d 574 (*Phillips*), overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, footnote 12, in which the court stated, malice is implied when "the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act

13

was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Phillips*, *supra*, at p. 587, now referred to as the *Phillips* test.)  These two lines of cases have been repeatedly described as articulating the same standard.  (*Knoller*, *supra*, 41 Cal.4th at p. 152; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219–1222 (*Dellinger*).)  In *Dellinger*, the Supreme Court approved CALCRIM No. 520 as a "straightforward" description of the conscious-disregard requirement.  (*Dellinger*, *supra*, at p. 1215, citing *Phillips*, at pp. 587–588.)

Three years after *Dellinger*, the high court in *Nieto Benitez*, reiterated that both tests articulated the same standard, and specifically rejected the argument that the trial court had a sua sponte duty to modify the form jury instruction on implied malice to include the "high probability" language contained in the *Thomas* test.  (*Nieto Benitez*, *supra*, 4 Cal.4th at p. 111.)  This was because "the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard."  (*Ibid*.)

In *Reyes*, the Supreme Court did not review CALCRIM No. 520, and did not hold that the instruction was incorrect or incomplete.  Instead, the court granted review of the denial of the defendant's resentencing petition (§ 1172.6) to determine where there was sufficient evidence to support the second degree murder of a person convicted and sentenced as an aider and abettor under the natural and probable consequences doctrine.  (*Reyes*, *supra*, 14 Cal.5th at p. 988.)  The court recognized it was unclear whether the trial court had upheld Reyes's murder conviction on a direct perpetrator theory or on the

14

theory that he directly aided and abetted an implied malice murder. (*Id*. at p. 987.) The court then addressed how the conviction could not be upheld under either theory. (*Ibid*.) It never ruled on the correctness of CALCRIM No. 520.

The only reference to the instruction found in the *Reyes* opinion was the Supreme Court's passing mention that in denying Reyes's petition, the lower court had said it was " 'guided by the principles that are in [CALCRIM No. 520], specifically implied malice.' " (*Reyes*, *supra*, 14 Cal.5th at p. 987.) It further noted that the trial court had found that the " 'defendant, along with several other gang members, one of which [was] armed, traveled to rival gang territory,' that the natural and probable consequence of their doing so was dangerous to human life, that Reyes was aware the act was dangerous to human life, and that he deliberately acted with conscious disregard for that danger." (*Ibid.*) The Supreme Court granted review of those findings and reversed after concluding the evidence did not support them.

Although the Supreme Court did discuss the element of "implied malice," its analysis was focused on whether the record evidence supported the lower court's determination that the defendant was a direct perpetrator. (*Reyes*, *supra*, 14 Cal.5th at p. 987.) But at trial, the People had relied solely on aiding and abetting theories to prove Reyes's liability for murder and had not argued he was a direct aider and abettor. (*Id.* at pp. 988–989.) Because another gang member had been the actual shooter, the Supreme Court held the denial of the defendant's resentencing petition was not supported by substantial evidence on either a direct perpetrator, or a direct aider and abettor theory. (*Id.* at p. 988.)

15

The propriety of CALCRIM No. 520 was not at issue and was not decided in *Reyes*, so *Reyes* is not authority for the proposition that the instruction was inadequate or incorrect. We recognize that the instruction was amended to include additional language after *Reyes* was decided, based on the Supreme Court's analysis of the two different lines of cases. But because the Supreme Court held that the two lines of cases were saying the same thing, the decision should not be construed as a holding that the definition contained in the instruction was erroneous. If the Supreme Court had intended to hold that the instruction was inadequate, it could have so held, but it did not.

Cases are not authority for propositions not considered. (*People v. Williams* (2004) 34 Cal.4th 397, 405, citing *People v. Barragan* (2004) 32 Cal.4th 236, 243.) Yet increasingly we see arguments identical to the argument raised here, relying on *Reyes*, as authority for the proposition that CALCRIM No. 520 is defective because it omits to add the language that is now included in the modified instruction. In our view, the addition of the language that the defendant's act "involved a high degree of probability that it would result in death" to CALCRIM No. 520 was an effort to acknowledge the Supreme Court's harmonization of the two lines of cases, both of which have been cited or followed without disapproval for decades.

The Defendant also argues that by not including the additional language, "the jury was provided no instruction as to how to assess the dangerousness of Defendant's act." We disagree.

We need to look no further than to the records admitted into evidence relating to Defendant's prior convictions for driving under the influence to find that Defendant was

subjectively aware that the act of driving under the influence of alcohol, alone or in combination with his ingestion of cannabis, were dangerous to human life.

In this respect, the documents admitted into evidence relating to both of Defendant's prior convictions for driving under the influence of alcohol, included the *Tahl* forms[8] executed by Defendant in each case. Both of the change of plea forms included a mandatory "*Watson* advisement"[9] stating: "You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safety operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder." (See Veh. Code, § 23593, subd. (a).) We note that this advisement has been required for all drunk driving convictions since 2004, five years before Defendant's first drunk driving conviction. (Veh. Code, § 23593, added Stats. 2004, ch. 502, § 1 (Assem. Bill No. 2173).)

In addition to the Defendant's acknowledgment on the change of plea forms, there is a certificate of completion a MADD (Mothers Against Drunk Driving) victim impact panel pertaining to Defendant's 2016 conviction. The exhibits pertaining to these documents have been transmitted to this court.

---

[8] Referring to *In re Tahl* (1969) 1 Cal.3d 122, 132–133.

[9] Referring to *People v Watson* (1981) 30 Cal.3d 290, 300–301.

The three separate advisements acknowledged by Defendant in his guilty pleas for each conviction, and in the certificate of completion of the MADD victim impact panel submitted in connection with his 2016 conviction, show that Defendant acknowledged the dangers of the *act* of driving while under the influence of alcohol or the combined influence of alcohol or drugs, and that if he drove while under the influence and someone were killed, he could be charged with murder. Given the Defendant's personal acknowledgment of the advisal on three separate documents, the jury was warranted in inferring he was subjectively aware that the acts of drinking and/or using marijuana while driving was "extremely dangerous to human life." Moreover, the jury could infer that Defendant was subjectively aware that if, as a result of his driving under the influence of alcohol and/or drugs, and if, as a result of that driving, someone is killed, he could be charged with murder.

Finally, Defendant admitted he was not aware of any authority holding that the language of CALCRIM No. 520 was inadequate. We conclude that the language of CALCRIM No. 520 was proper as given, even as we welcome the modification.

2. ***The Trial Court Properly Rejected Defendant's Proffered Pinpoint Instruction***

Defendant argues the trial court erroneously refused to give a pinpoint instruction explicating the subjective aspect of implied malice. We disagree.

a. *Additional Background*

In his motions in limine, Defendant requested a pinpoint instruction stating, " 'The state of mind of a person who acts with conscious disregard for human life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' It

18

is a subjective mental state in that you must find the defendant actually appreciated the risk of his actions at the time he acted.' " Defendant cited the cases of *People v. Tseng* (2018) 30 Cal.App.5th 117, and *People v. Olivas* (1985) 172 Cal.App.3d 984, as authority. The court deferred the issue until the time for discussing instructions.

During the discussions of instructions, as the court and counsel discussed CALCRIM No. 520, defense counsel requested that his proffered pinpoint instruction be incorporated in it. The People objected. The court noted that CALCRIM No. 520 effectively embodied the concept set out in the Defendant's pinpoint instruction and then asked if defense counsel were aware of any case holding that the current definition was insufficient. Defense counsel replied he was not aware of any such authority. The court therefore refused the request to incorporate the additional language because it was appropriately embodied in CALCRIM No. 520.

The relevant portion of CALCRIM No. 520, relating to the subjective aspect of implied malice, states: "The defendant had *implied malice* if: [¶] 1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life."

b.      *General Principles Relating to Pinpoint Instructions.*

"Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive

19

of the theory, but they are not required to be given sua sponte.' " (*People v. Scully* (2021) 11 Cal.5th 542, 592, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1119 (*Saille*).) "Pinpoint instructions ' "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case." ' " (*People v. Lyon* (2021) 61 Cal.App.5th 237, 252, citing *People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)

Pinpoint instructions are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte. (*Saille*, *supra*, 54 Cal.3d at p. 1119.) "A defendant is entitled to an instruction relating particular facts to any legal issue." (*People v. Sears* (1970) 2 Cal.3d 180, 190.) A trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, that is argumentative, duplicative, or potentially confusing; or is not supported by substantial evidence. (*People v. Dunn* (2025) 18 Cal.5th 129, 187–188, quoting *People v. Zaragoza* (2016) 1 Cal.5th 21, 53; *People v. Moon* (2005) 37 Cal.4th 1, 30; *People v. Gurule* (2002) 28 Cal.4th 557, 659.) If all the proper matters included in the refused instruction were fully covered by other instructions, no prejudice results to the defendant by the court's refusal to give the offered instruction. (*People v. Barrett* (2025) 17 Cal.5th 897, 994.)

c. *Analysis*

The legal principles presented in Defendant's proffered pinpoint instruction simply restated the language of CALCRIM No. 520 regarding the subjective component of implied malice. The only difference between the two instructions (the relevant portion of CALCRIM No. 520 and Defendant's proffered pinpoint instruction) is the colloquial language used in the Defendant's proffered pinpoint instruction. The pinpoint instruction

20

did not expand on the legal theory relied upon by the defense, which was fully covered in CALCRIM No. 520.

A " 'judge need not include a legally correct jury instruction when it is duplicative of other instructions provided to the jury.' " (*People v. Ramirez* (2021) 10 Cal.5th 983, 1009, citing *People v. San Nicolas* (2004) 34 Cal.4th 614, 675.)  Because the content of the pinpoint instruction was adequately covered by CALCRIM No. 520, there was no need to also instruct with the language of CALJIC No. 8.71.  (See, e.g., *San Nicolas*, *supra*, at p. 675.)

The court did not err in refusing to give the requested pinpoint instruction where it merely restated the legal principles already covered in CALCRIM No. 520.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.
FIELDS
J.

21